## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| H & T Fair Hills, Ltd., Norman Zimmerman, Donna Zimmerman, Steven Wherry, Valerie Wherry, Robert Ruebel, Mary Ruebel and Larry Ruebel, on behalf of themselves and all others similarly situated, | Court File No.:_____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| Alliance Pipeline L.P., a/k/a Alliance USA, | |
| Defendant. | |

Plaintiffs H & T Fair Hills, Ltd., Norman Zimmerman, Donna Zimmerman, Steven Wherry, Valerie Wherry, Robert Ruebel, Mary Ruebel and Larry Ruebel, (collectively, "Plaintiffs"), on behalf of themselves and others similarly situated, bring this class action against Alliance Pipeline L.P., a/k/a Alliance USA ("Alliance") and allege the following:

### NATURE OF THE ACTION

1.     This action arises from the construction, installation, operation, maintenance and existence of a natural gas pipeline ("the Pipeline") running from Calgary, Alberta to Chicago, Illinois that, through a series of easement and right-of-way

agreements (collectively, "Easements"),  Alliance buried on the property of Plaintiffs and Class Members located in North Dakota, Minnesota, Iowa, and Illinois.

2.     As a result of the construction, installation, operation, maintenance and existence of the Pipeline, Plaintiffs and Class Members have experienced ongoing, permanent and uncompensated crop yield losses on the land under which the Pipeline runs ("Easement Land"), as well as on land adjacent to the easement. ("Adjacent Land").

## PARTIES

3.     Defendant Alliance is a Delaware limited partnership with its principal place of business in Calgary, Canada. Upon information and belief, its principal United States office is located in Eden Prairie, Minnesota.

4.     Upon information and belief, Alliance owns, operates and maintains the entire length of the Pipeline that goes through North Dakota, Minnesota, Iowa and Illinois.

5.     Plaintiff H & T Fair Hills, Ltd. ("H & T Fair Hills"), is an Iowa farm corporation with its principal place of business in Monticello, Jones County, Iowa. H & T Fair Hills is a successor in interest to the Alliance Pipeline L.P. Easements recorded with the Jones County, Iowa Recorder on September 11, 1998, for Tracts IA-JO-0460, IA-JO-0462 and IA-JO-0463, and on April 13, 1998, for Tract IA-JO-0467 (collectively, "the H & T Fair Hills Tracts" or "the H & T Fair Hills Easements"). H & T Fair Hills Tracts IA-JO-0460, IA-JO-0462 and IA-JO-4063 were purchased by and transferred to Mark and Debra Heins in 1995, owners of H & T Fair Hills, under a contract for deed with George and Bonnie Tobiason. The Grantors on the H & T Fair Hills Easement for Tracts IA-JO-

0460, IA-JO-0462 and IA-JO-4063 are George H. Tobiason and Bonnie J. Tobiason (Contract Sellers), and Mark W. Hein and Debra L. Hein (Contract Buyers). The Grantee is Alliance. H & T Fair Hills Tract IA-JO-0467 is owned by Nicholas Hein, current President of H & T Fair Hills and the successor in interest to an Easement between Ruth Schoon as the Grantor and Alliance as the Grantee. H & T Fair Hills has rented and farmed Tracts IA-JO-0460, IA-JO-4062 and IA-JO-4063 continuously since 1995, and has rented and farmed Tract IA-JO-0467 continuously since 2006.

6.    Plaintiffs Norman Zimmerman and Donna Zimmerman are husband and wife, residing in Monticello, Jones County, Iowa. Norman and Donna Zimmerman are the Grantors of two Easements dated November 24, 1998, with respect to Tract Nos. IA-JO-0440 and IA-JO-0443 (collectively, "the Zimmerman Tracts" or "Zimmerman Easements"). The Grantee on the Zimmerman Easements is Alliance. The Zimmerman Easements were recorded with the Jones County, Iowa Recorder on December 7, 1998.

7.    Plaintiffs Steven Wherry and Valerie Wherry are husband and wife, residing in Wyoming, Jones County, Iowa. Steven and Valerie Wherry are the Grantors of an Easement dated May 28, 1998, with respect to Tract No. IA-JO-0496 ("the Wherry Tract" or "Wherry Easement"). The Grantee on the Wherry Easement is Alliance. The Wherry Easement was recorded with the Jones County, Iowa Recorder on July 16, 1998.

8.    Plaintiffs Robert Ruebel, Mary Ruebel and Larry Ruebel (collectively, "the Ruebels") reside in Olivia, Renville County, Minnesota. The Ruebels are the Grantors of an Easement dated May 21, 1999, with respect to Tract No. MN-RN-0378, and are the successors in interest to an Easement dated May 27, 1999, on Tract No. MN-RN-0377

3

with Clyde Ruebel as the Grantor (collectively, "the Ruebel Tracts" or "Ruebel Easements"). The Grantee on the Ruebel Easements is Alliance. The Ruebel Easements were recorded with the Renville County, Minnesota Recorder on June 8 for Tract MN-RN-0378 and June 24, 1999 for Tract No. MN-RN-0377. Tract No. MN-RN-0378 has been owned by the Ruebels since 1996, and Tract No. MN-RN-0377 has been owned by the Ruebels since 2000.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), in that the matter in controversy, exclusive of interest and costs, exceeds the sum of $5,000,000 and is a class action in which members of the Class are citizens of a state different from Alliance.

10.     This Court has personal jurisdiction over Defendant because it conducts significant business in this District, and unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from this District.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' and Class Members' claims occurred in this District. Alliance is authorized to do business in this District and is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### The Pipeline

12.     Alliance is a natural gas pipeline company that transports natural gas in interstate commerce.

4

13.     The United States portion of the Pipeline consists of approximately 886.8 miles of 36-inch diameter mainline pipeline and seven (7) compressor stations, extending southeast from the United States-Canada border in Renville County, North Dakota, through North Dakota, Minnesota, Iowa, and Illinois to the Chicago area where it connects with the United States pipeline grid.

### FERC Authorization and the Agricultural Impact Mitigation Agreements

14.     On December 24, 1996, Alliance submitted an application to the Federal Energy Regulatory Commission ("FERC") entitled "Application of Alliance Pipeline, L.P. for a Certificate of Public Convenience and Necessity" ("the Application").

15.     In the Application, Alliance sought, *inter alia*, "a certificate of public convenience and necessity, authorizing Alliance to construct, own, operate and maintain approximately 886.8 miles of 36-inch pipeline, together with ancillary facilities;" as well as "a blanket certificate…authorizing the transportation of natural gas…" in interstate commerce.

16.     In 1997, Alliance also entered into Agricultural Impact Mitigation Agreements ("AIMA") with the Attorneys General of Iowa, Minnesota, North Dakota, and Illinois (collectively, "the AIMAs"). The AIMAs established an obligation "to mitigate, or provide compensation for, negative agricultural impacts that may occur due to Pipeline Construction" and for crop and other losses in subsequent years. *See* AIMA Preamble, Exhibits ("Exs.") 1, 2 and 3.

17.     The Iowa and Minnesota AIMA dated September 2, 1997, requires Alliance to compensate landowners and tenants for:

> [D]amages, losses or inconvenience caused by [Alliance] which occurred on or off the Pipeline Right-of-Way associated with construction, installation, operation, maintenance and existence of the Pipeline. These damages, losses or inconveniences may include but are not limited to loss of crops, pasture, timber, trees, produce, livestock, fences, drain Tiles, irrigation systems or equipment.

Iowa and Minnesota AIMA, Ex. 1, ¶ 22.

18.   The North Dakota AIMA dated September 30, 1997, requires Alliance to

compensate landowners and tenants for:

> [D]amages to private property caused by [Alliance] beyond the initial construction of the Pipeline, to include . . . future construction, operation, maintenance, and repairs. . . . Such damages may include but are not limited to loss of crops. . . .

North Dakota AIMA, Ex. 2, ¶ 8(B).

19.   The Illinois AIMA dated April 25, 1997, requires Alliance to compensate

landowners and tenants for:

> [D]amages to private property caused by [Alliance] beyond the initial construction of the pipeline, to include those damages caused by [Alliance] during future construction, operation, maintenance, and repairs relating to the pipeline.

Illinois AIMA, Ex. 3, ¶ 10(B).

20.   The AIMAs set forth the standards by which the Pipeline was to be

constructed, including the depth at which the Pipeline was to be buried when it passed

under agricultural land, as well as the process by which Alliance was to separate,

preserve and backfill disturbed topsoil. *See* Iowa and Minnesota AIMA, Ex. 1, ¶¶ 1-2;

North Dakota AIMA, Ex. 2, ¶¶ 1-2; Illinois AIMA, Ex. 3, ¶¶ 1-2.

21.    On September 17, 1998, FERC approved the Application, and issued an Order of a Certificate of Public Convenience and Necessity ("the Certificate" or "the FERC Certificate") authorizing Alliance to construct, operate and maintain the Pipeline. *See* 84 FERC 61239, 1998 WL770202. That approval was subject to certain conditions, including compliance with a FERC Environmental Impact Statement, and compliance with the AIMAs between Alliance and the States of North Dakota, Minnesota, Iowa and Illinois. FERC determined, *inter alia*, that construction of the Pipeline would disturb soils and cause loss of soil productivity. *Id*. at *13. FERC further determined that construction of the Pipeline and soil disturbance "could result in long term impacts" on soil productivity and that Alliance "would be responsible for ensuring the correction of all such problems in accordance with the AIMAs." *Id*.

22.    Under the FERC Certificate and AIMAs, Alliance was and is required to mitigate and compensate soil productivity loss for as long as it occurs. Alliance represented and acknowledged in its FERC filings that it would "reasonably compensate landowners and/or tenants for future damages, losses or inconveniences that are directly associated with the construction, operation or maintenance of the pipeline facility." *Id*. at *31, fn 31 (quoting March 23, 1998 Alliance representations to FERC).

## The Easements

23.    Contemporaneously with seeking FERC approval, Alliance, by and through its authorized agents, began soliciting landowners, successors-in-interest and operators in North Dakota, Minnesota, Iowa and Illinois (collectively, "Land Interest Holders") for the purpose of acquiring Easements for the Pipeline.

24.     Alliance, through its authorized agents, sent solicitation letters to Land Interest Holders with prepared Easements and offers of monetary compensation.

25.     Shortly after sending its solicitation letters, Alliance agents began meeting with Land Interest Holders to acquire the Easements. In those meetings, Alliance agents represented that Alliance would compensate landowners and tenants for all future damages, losses, or inconveniences associated with the Pipeline for as long as any damages, losses, or inconveniences occurred. Further, in those meetings with Land Interest Holders, Alliance agents represented that Alliance would pay crop yield losses for as long as such crop yield losses occurred and could be substantiated by that Land Interest Holder. On information and belief, Alliance agents made these representations to induce each Land Interest Holder to enter into Easements with Alliance.

26.     In the Easements it acquired from Land Interest Holders, Alliance agreed to pay for all damages sustained including, but not limited to, "damages . . . which may arise from the laying, constructing, maintaining, operating, repairing, replacing or removing of the said pipeline." Zimmerman Easements, Exs. 4 and 5; *see* Ruebel Easements, Exs. 6-7 ("By acceptance of the benefits hereunder, the Grantee shall be deemed to have agreed to be bound by the terms, stipulations and conditions applicable to Grantee hereunder under [the Iowa and Minnesota AIMA] . . . which is incorporated herein by reference. . . . Grantee hereby expressly covenants and agrees with Grantor that Grantee will implement all mitigative actions contained in the [Iowa and Minnesota AIMA] including those actions from which the Grantee otherwise may be excused from

implementing . . ."); *see also*, H & T Fair Hills Easements, Exs. 8-9; Wherry Easement, Ex. 10.

27.     The Easements required that Alliance comply with the applicable AIMA, which in turn supplemented the obligations imposed by FERC. *See* Iowa and Minnesota, North Dakota and Illinois AIMA Preambles, Exs. 1, 2 and 3 (the AIMA "measures are intended to mitigate, or provide compensation for, negative agricultural impacts that may occur due to Pipeline construction. . . . The mitigation measures described [in the AIMAs] are intended to supplement the measures included in the FERC's [Certificate].").

28.     Once Alliance acquired the Easements, Alliance recorded them and proceeded to construct, operate and maintain the Pipeline.

## Pipeline Construction

29.     On or about February 1999, Alliance began construction of the Pipeline.

30.     Alliance's Pipeline construction disturbed at least 11,875 acres of land, including at least 10,613 acres of prime agricultural land in North Dakota, Minnesota, Iowa and Illinois.

31.     On September 14, 2000, Alliance made its request to FERC to commence service. On September 29, 2000, in response to a data request by FERC staff to supplement Alliance's request for written authorization to commence service, Alliance acknowledged to FERC that Alliance had compensated Land Interest Holders for construction damages, and had an obligation to pay crop yield losses in the future as long as crop yield losses  occurred:

> Two years of crop damages were paid or offered to each
> landowner to compensate for the 1999 and 2000 growing
> season . . . following construction of the 1999 spreads.
> Alliance will continue to work with landowners that have
> crop productivity concerns in future growing seasons.
> Appropriate land restoration will be conducted and/or crop
> damages paid. . . .

Alliance Restoration Plan, Ex. 11.

32.　　By December 2000, Alliance commenced Pipeline operations.

33.　　On information and belief, the Pipeline has been in continuous operation since the commencement date. Alliance continues to operate and maintain the Pipeline that has damaged and continues to damage Plaintiffs and Class Members.

34.　　Upon information and belief, during construction Alliance did not bury the Pipeline to the depths specified by the AIMAs and the Easements.

35.　　The Pipeline transfers heat into Easement and Adjacent Land as demonstrated by snowmelt in the winter. On information and belief, this heat transfer, which is generated year-round as a result of the Pipeline's existence and operation, causes crop yield losses along the entire length of the Pipeline. The below photos on the property of H & T Fair Hills demonstrates the heat transference from the Pipeline.













36.    Alliance also did not follow the process to separate, preserve and backfill

disturbed topsoil, as required by the Easements and AIMAs.

37.    As a result of, *inter alia*, the heat transfer, inadequate burial depth and Alliance's failure to properly backfill the Pipeline trench and restore the topsoil, Easement and Adjacent Land does not adequately drain during the growing season. The below photo of H & T Fair Hills Easement and Adjacent Land demonstrates this drainage problem.



**The Alliance Crop Loss Program**

38.    In or about July 2000, Alliance began complying with its obligations to compensate Land Interest Holders for crop yield losses on Easement Land, which Alliance named the Crop Loss Program.

39.    Alliance implemented the Crop Loss Program to fulfill its obligations under, *inter alia,* the Easements and AIMAs to compensate Land Interest Holders for crop yield losses.

40.    Under the Crop Loss Program, Alliance required Land Interest Holders to provide four (4) to six (6) weeks' notice prior to their projected harvest date. Alliance then arranged to have a yield assessment performed by professional agronomists who

were required to submit their data exclusively to Alliance. If final yield reductions on Easement Land were greater than normal field variations, Alliance was to compensate Land Interest Holders for their crop yield loss.

41.     On information and belief, due to the continuous heat transfer from the Pipeline and the soil disruption from construction, Plaintiffs consistently sustained crop yield losses in excess of twenty-five percent (25%) on their Easement Land, and additional crop yield losses on Adjacent Land. On information and belief, all Class Members have sustained similar losses.

42.     On or about April 27, 2001, Alliance confirmed that the Crop Loss Program was to compensate Land Interest Holders for ongoing crop yield losses caused by the construction, operation and existence of the Pipeline:

> As the growing season progresses, we will . . . identify areas with potential yield problems . . . In most cases, a simple yield check will be sufficient for further conversations and negotiations.

2001 Crop Loss Program Form Letter, Ex. 12.

43.     On or about July 26, 2002, Alliance again confirmed that the Crop Loss Program was to compensate Land Interest Holders for ongoing crop yield losses caused by the construction, operation and existence of the Pipeline:

> As a continuation of our ongoing commitment to you, our stakeholder, we thought it appropriate to again review Alliance's established programs. . . .
>
> \* \* \*
>
> If you perceive a reduced yield . . . attributable to our pipeline construction, please call us at least one (1) month prior to harvest. . . .
>
> \* \* \*
>
> [We will] work with you to assess your claim and reach a fair and final determination of any loss attributable to the construction of the Alliance system.

2002 Crop Loss Program Claims Form Letter, Ex. 13.

44.     On or about May 22, 2003, Alliance again confirmed that the Crop Loss Program was to compensate Land Interest Holders for ongoing crop yield losses caused by the construction, operation and existence of the Pipeline:

> If you believe you have a crop loss related to original pipeline construction and would like to have your field assessed, please contact Alliance . . . Those fields that have yield reductions . . . will be eligible to receive compensation for the lost yields.

2003 Crop Loss Program Form Letter, Ex. 14.

45.     On or about July 10, 2006, Alliance again confirmed that the Crop Loss Program was to compensate Land Interest Holders for ongoing crop yield losses caused by the construction, operation and existence of the Pipeline:

> If you feel you have a crop loss claim related to construction . . . Alliance will arrange to have a yield assessment by a professional agronomist. Areas with yield reductions greater than normal field variations . . . will be eligible to receive compensation for the lost yields.

2006 Crop Loss Program Form Letter, Ex. 15.

46.     On or about July 9, 2007, Alliance again confirmed that the Crop Loss Program was to compensate Land Interest Holders for crop yield losses caused by the construction, operation and existence of the Pipeline:

> If you feel you have a crop loss claim related to construction . . . Alliance will arrange to have a yield assessment by a professional agronomist. Areas with yield reductions greater than normal field variations . . . will be eligible to receive compensation for the lost yields.

2007 Crop Loss Program Form Letter, Ex. 16.

47.     On or about June 9, 2010, Alliance again confirmed that the Crop Loss Program was to compensate Land Interest Holders for crop yield losses caused by the construction, operation and existence of the Pipeline:

> If you feel you have a crop loss claim related to construction . . . Alliance will arrange to have a yield assessment by a professional agronomist. Areas with yield reductions greater than normal field variations . . . will be eligible to receive compensation for the lost yields.

2010 Crop Loss Program Form Letter, Ex. 17.

48.     On or about July 1, 2012, Alliance again confirmed that the Crop Loss Program was to compensate Land Interest Holders for crop yield losses caused by the construction, operation and existence of the Pipeline:

> If you feel you have a crop loss claim related to construction . . .
> Alliance will arrange to have a yield assessment by a professional
> agronomist. Areas with yield reductions greater than normal field
> variations . . . be eligible to receive compensation for the lost
> yields.

2012 Crop Loss Program Form Letter, Ex. 18.

      49.    On or about June 10, 2013, Alliance again confirmed that the Crop Loss

Program was to compensate Land Interest Holders for crop yield losses caused by the

construction, operation and existence of the Pipeline, but refused to provide a certified

agronomist to perform the yield analyses:

> Alliance Pipeline L.P. (Alliance) will again be offering a crop yield
> program in 2013 as part of our ongoing effort to monitor the
> condition of the right-of-way. *However, Alliance will no longer
> provide a certified agronomist to perform the yield check.* Please
> note that the 2013 program will require you and your representatives
> to communicate more frequently with Alliance to ensure timely
> scheduled yield checks.

>                           * * *

> If you feel you have a crop loss claim related to construction of the
> Alliance Pipeline . . . and inform Alliance of the crop type and
> expected harvest timeframe.

>                           * * *

> The Alliance Representative will record the yield numbers while on
> site and the yield numbers will be entered into the Alliance database
> system. Alliance will review all information and determine if the
> yield sample was satisfactory and address any concerns when they
> arise.

2013 Crop Loss Program Form Letter, Ex. 19 (emphasis in original).

**Alliance Unilaterally Terminated The Crop Loss Program**

50.    In violation of its obligations under the Easements and AIMAs, on July 1,

2015, Alliance unilaterally terminated the Crop Loss Program. At this point, Alliance for

the first time claimed it was not obligated to compensate Land Interest Holders for crop

yield losses for as long as they occurred and could be substantiated:

> After fifteen years, the Alliance Pipeline L.P. (Alliance) crop yield
> program has reached the end of its life, and will be terminated in
> 2015.
>
> * * *
>
> Alliance does want to reaffirm that the termination of the voluntary
> program does not end Alliance's commitment and obligation to
> reimburse for any damage that you may incur as the result of
> *operational activity* that Alliance will still be performing from time
> to time.

2015 Crop Loss Program Form Letter, Ex. 20 (emphasis added).

51.    Alliance's unilateral termination of the Crop Loss Program violated, *inter*

*alia,* (i) the representations its agents made to induce the Land Interest Holders to execute

the Easements; (ii) the Easement terms and conditions; (iii) the applicable AIMA terms

and conditions; (iv) the representations that Alliance made to FERC to obtain its approval

to commence operations; and (v) the multiple and repeated representations made to Land

Interest Holders during the Crop Loss Program.

52.    Alliance's declaration that it was liable for crop yield losses only if its

personnel performed "operational activity" was contrary to, *inter alia*, (i) the

representations its agents made to induce the Land Interest Holders to execute the

Easements; (ii) the Easement terms and conditions; (iii) the applicable AIMA terms and

18

conditions; (iv) the representations that Alliance made to FERC to obtain its approval to commence operations; and (v) the multiple and repeated representations made to Land Interest Holders during the Crop Loss Program.

53.     The phrase "operational activity" appears nowhere in the Easements or AIMAs. There was no such "operational activity" prerequisite for Alliance's liability for crop yield losses.

54.     After receipt of the 2015 notification that the Crop Loss Program would be unilaterally terminated by Alliance, many Land Interest Holders continued to hire agronomists and submit their crop loss claims to Alliance just as they had in the past. *See, e.g.*, August 14, 2015 H & T Fair Hills (Nicholas Hein) Letter to Alliance, Ex. 21.

55.     On information and belief, in 2015 and continuously thereafter Alliance, in violation of the Easements, AIMAs, and Crop Loss Program, as well as its representations before and after the Easements were executed, denied all claims for crop yield loss compensation, alleging that it had conducted no "operational activities," and accordingly there could be no crop yield losses for which it was responsible. *See, e.g.*, August 17, 2015 Alliance Letter to H & T Fair Hills (Nicholas Hein), Ex. 22.

56.     Since its obligation to pay Land Interest Holders under the Easements, AIMAs and Crop Loss Program was not dependent on Alliance undertaking "operational activities," its denials were a breach of its duties as to Plaintiffs and each Class Member.

## FACTUAL ALLEGATIONS
## RELATED TO PLAINTIFF H & T FAIR HILLS, LTD.

57.     H & T Fair Hills owns and operates a farm in Jones County, Iowa.

58.     In or about 1998, the owners of H & T Fair Hills at the time, Mark and Debra Hein, and their son Nick Hein personally met with Kenneth Goulart, an Alliance representative, to negotiate Alliance's acquisition of an easement to construct the Pipeline on the H & T Fair Hills Tracts.

59.     During these negotiations, Goulart represented that H & T Fair Hills would be compensated for any crop yield losses on the H & T Fair Hills Easements for as long as crop yield losses occurred and H & T Fair Hills could substantiate crop yield losses.

60.     H & T Fair Hills entered into the Easement on Tracts IA-JO-4060, IA-JO-4062 and IA-JO-4063 in reliance on Goulart's representations that Alliance would pay H & T Fair Hills' crop yield losses for as long as they occurred and H & T Fair Hills could substantiate them.

61.     Since its construction in 2000, the Pipeline has caused an ongoing annual decrease in crop yield on Easement Land for Tracts IA-JO-4060, IA-JO-4062 and IA-JO-4063 and Adjacent Land rented and operated by H & T Fair Hills. The Pipeline has caused ongoing annual decrease in crop yield on Easement Land for Tract IA-JO-4067 and Adjacent Land rented and operated by H & T Fair Hills since 2006.

62.     These crop yield losses have not subsided over time.

63.     H & T Fair Hills submitted claims pursuant to the Crop Loss Program since the inception of the Crop Loss Program in May of 2000, and received compensation for crop yield losses on Easement Land through the 2014 growing season.

20

64.     H & T Fair Hills met all terms and conditions of, *inter alia*, the H & T Fair Hills Easements, the Iowa and Minnesota AIMA and the Crop Loss Program. *See* Exs. 1, 8-9, 12-22.

65.     From the date H & T Fair Hills first made a claim for crop yield loss damages up and until January 2015, Defendant made payments for some, but not all, of the Easement Land crop yield losses sustained by H & T Fair Hills.

66.     H & T Fair Hills has not received full compensation for the value of its Easement Land crop yield loss damages caused by the Pipeline.  H & T Fair Hills has never been compensated for its Adjacent Land crop yield losses.

67.     Alliance represented that the crop loss payments to H & T Fair Hills were based upon the certified agronomists' true and accurate determination of H & T Fair Hills' total yield loss and its equivalent value.

68.     Alliance used the following formula to calculate the value of crop damages: the amount of acres encumbered by the easement multiplied by the bushel per acre yield for crops off the right-of-way, multiplied by the price per bushel, multiplied by the percentage of yield loss. The short formula is as follows:

*Acres Encumbered **x** Bushels-Per-Acre **x** Price **x** Decreased Yield % = Crop Loss Value.*

69.     Throughout the life of the Crop Loss Program, Alliance used USDA prices, which were lower than the market prices H & T Fair Hills actually received for its crops, resulting in H & T Fair Hills being undercompensated for its Easement Land crop yield losses.

70.   H & T Fair Hills is entitled to have its Easement Land Crop Loss payments recalculated based on market prices.

71.   In August 2015, H & T Fair Hills submitted a claim for crop yield loss based on a yield analysis performed by a certified agronomist.

72.   In response to H & T Fair Hills' 2015 crop yield loss claim, on August 17 Alliance responded as follows:

> Thank you for your correspondence dated August 14, 2015. Alliance appreciates and understands your desire to have the yield program continued. However as stated in our June 18, 2015 correspondence, Alliance has terminated the yield program and therefore will not be performing any program related activities.
>
> While Alliance has elected to end the yield program it remains committed to reimburse for any damages that you may incur as the result of operational activities. In this respect Alliance is currently unaware of any operational activities on your tracts in 2015 that have resulted in damages. If you are aware of any activities during the growing season that you believe have resulted in damages, please let us know so that we can evaluate your claim. . . .

Ex. 22.

73.   H & T Fair Hills is currently entitled to payments for the 2015, 2016, 2017, 2018 harvest and every harvest into the future that sustains crop yield losses on Easement and Adjacent Land.

## FACTUAL ALLEGATIONS
## RELATED TO PLAINTIFFS NORMAN AND DONNA ZIMMERMAN

74.   Norman and Donna Zimmerman own and operate a farm in Jones County, Iowa.

75.    In or about 1998, Norman Zimmerman personally met with Goulart to negotiate Alliance's acquisition of an easement to construct the Pipeline on the Zimmerman Tracts.

76.    During these negotiations, Goulart represented that the Zimmermans would be compensated for any crop yield losses on the Zimmerman Easements for as long as crop yield losses occurred and the Zimmermans could substantiate crop yield losses.

77.    The Zimmermans entered into the Zimmerman Easements in reliance on Goulart's representations that Alliance would pay the Zimmermans' crop yield losses for as long as they occurred and the Zimmermans could substantiate them.

78.    Since its construction in 2000, the Pipeline has caused an ongoing annual decrease in crop yield on both Easement Land and Adjacent Land owned and operated by the Zimmermans.

79.    These yield losses have not subsided over time.

80.    The Zimmermans submitted claims pursuant to the Crop Loss Program since the inception of the Crop Loss Program in May of 2000, and received compensation for crop yield losses on Easement Land through the 2014 growing season.

81.    The Zimmermans met all terms and conditions of, *inter alia*, the Zimmerman Easements, the Iowa and Minnesota AIMA and the Crop Loss Program. *See* Exs. 1, 4-5, and 12-22.

82.    From the date the Zimmermans first made a claim for crop damages up and until January 2015, Defendant made payments for some, but not all, of the Easement Land crop yield losses sustained by the Zimmermans.

83.     The Zimmermans have not received full compensation for the value of their Easement Land crop yield loss damages caused by the Pipeline. The Zimmermans have never been compensated for their Adjacent Land crop yield losses.

84.     Alliance represented that the crop loss payments to the Zimmermans were based upon the certified agronomists' true and accurate determination of the Zimmermans' total yield loss and its equivalent value.

85.     Alliance used the same formula identified in Paragraph 68 above to calculate the value of crop damages.

86.     Throughout the life of the Crop Loss Program, Alliance used USDA prices, which were lower than the market prices the Zimmermans actually received for their crops, resulting in the Zimmermans being undercompensated for their Easement Land crop yield losses.

87.     The Zimmermans are entitled to have their Easement Land Crop Loss payments recalculated based on market prices.

88.     The Zimmermans are also entitled to crop yield loss compensation for the 2015, 2016, 2017, 2018 harvests, and every harvest into the future sustaining crop yield losses on Easement and Adjacent Land.

## FACTUAL ALLEGATIONS
## RELATED TO PLAINTIFFS STEVEN AND VALERIE WHERRY

89.     Steven and Valerie Wherry own and operate a farm in Jones County, Iowa.

90.    In or about 1998, Steven Wherry personally met with Kenneth Goulart, an Alliance representative, to negotiate Alliance's acquisition of an easement to construct the Pipeline on the Wherry Tract.

91.    During these negotiations, Goulart represented that the Wherrys would be compensated for any crop yield losses on Wherry Easement for as long as crop yield losses occurred and the Wherrys could substantiate crop yield losses.

92.    The Wherrys entered into the Wherry Easement in reliance on Goulart's representations that Alliance would pay the Wherrys' crop yield losses for as long as they occurred and the Wherrys could substantiate them.

93.    Since its construction in 2000, the Pipeline has caused an ongoing annual decrease in crop yield on both Easement Land and Adjacent Land owned and operated by the Wherrys.

94.    These yield losses have not subsided over time.

95.    The Wherrys submitted claims pursuant to the Crop Loss Program since the inception of the Crop Loss Program in May of 2000, and received compensation for crop yield losses on Easement Land through the 2014 growing season.

96.    The Wherrys met all terms and conditions of, *inter alia*, the Wherry Easement, the Iowa and Minnesota AIMA and the Crop Loss Program. *See* Exs. 1, 10, 12-22.

97.    From the date the Wherrys first made a claim for crop damages up and until January 2015, Defendant made payments for some, but not all, of the Easement Land crop yield losses sustained by the Wherrys.

25

98.    The Wherrys have not received full compensation for the value of their Easement Land crop yield loss damages caused by the Pipeline.

99.    Alliance represented that the crop loss payments to Wherry were based upon the certified agronomists' true and accurate determination of Wherrys' total yield loss and its equivalent value.

100.    Alliance used the same formula identified in Paragraph 68 above to calculate the value of crop damages.

101.    Throughout the life of the Crop Loss Program, Alliance used USDA prices that were lower than the market prices the Wherrys actually received for their crops, resulting in the Wherrys being undercompensated for their Easement Land crop yield losses.

102.    The Wherrys are entitled to have their Easement Land Crop Loss payments recalculated based on market value.

103.    The Wherrys are also entitled to crop yield loss compensation for the 2015, 2016, 2017, 2018 harvests, and every harvest into the future sustaining crop yield losses on Easement and Adjacent Land.

## FACTUAL ALLEGATIONS RELATED TO PLAINTIFFS ROBERT RUEBEL, MARY RUEBEL, AND LARRY RUEBEL

104.    Robert Ruebel, Mary Ruebel and Larry Ruebel are the owners of a farm in Renville County, Minnesota.

105.    The Ruebel Tracts have been leased to, and farmed by, various tenants from 2000 to present. However, pursuant to those leases, the Ruebels have the rights to all payments from Alliance for crop yield loss or other damages caused by the Pipeline.

106.    In or about 1998, Robert Ruebel personally met with Don Ellis, an Alliance representative, to negotiate Alliance's acquisition of an easement to construct the Pipeline on Ruebel Tract No. MN-RN-0378.

107.    During these negotiations, Ellis represented that the Ruebels would be compensated for any crop yield losses on the Ruebel Easements for as long as crop yield losses occurred and the Ruebels could substantiate crop yield losses.

108.    The Ruebels entered into the Ruebel Easement for Tract No. MN-RN-0378 in reliance on Ellis' representations that Alliance would pay the Ruebels' crop yield losses for as long as they occurred and the Ruebels could substantiate them.

109.    Since its construction in 2000, the Pipeline has caused an ongoing annual decrease in crop yield on both Easement Land and Adjacent Land owned and operated by the Ruebels.

110.    These yield losses have not subsided over time.

111.    The Ruebels submitted claims pursuant to the Crop Loss Program since the inception of the Crop Loss Program in May of 2000, and received compensation for crop yield losses on Easement Land through the 2014 growing season.

112.    The Ruebels met all terms and conditions of, *inter alia*, the Ruebel Easements, the Iowa and Minnesota AIMA and the Crop Loss Program. *See* Exs. 1, 6-7, 12-22.

113.    From the date the Ruebels first made a claim for crop damages up and until January 2015, Defendant made payments for some, but not all, of the Easement Land crop yield losses sustained by the Ruebels.

114.    The Ruebels have not received full compensation for the value of their Easement Land crop yield loss damages caused by the Pipeline.

115.    Alliance represented that the crop loss payments to the Ruebels were based upon the certified agronomists' true and accurate determination of the Ruebels' total yield loss and its equivalent value.

116.    Alliance used the same formula identified in Paragraph 68 above to calculate the value of crop damages.

117.    Throughout the life of the Crop Loss Program, Alliance used USDA prices that were lower than the market prices the Ruebels actually received for their crops, resulting in the Ruebels being undercompensated for their Easement Land crop yield losses.

118.    The Ruebels are entitled to have their Easement Land Crop Loss payments recalculated based on market prices.

119.    The Ruebels are also entitled to crop yield loss compensation for the 2015, 2016, 2017, 2018 harvests, and every harvest into the future sustaining crop yield losses on Easement and Adjacent Land.

## CLASS ACTION ALLEGATIONS

120.    This lawsuit is being brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure because the class is so numerous that joinder of all

members is impracticable and there are predominating questions of law and fact common to the class.

121.    Plaintiffs bring their claims on behalf of the Class, which is defined as:

> All persons or businesses that held an ownership or leasehold interest, from December, 2000 to present, in any agricultural property in Iowa, Minnesota, North Dakota, or Illinois on which Alliance constructed the Pipeline pursuant to an Easement.

122.    Excluded from the Class are a) any Judge or Magistrate presiding over this action and members of their families; b) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and the current or former employees of any of these entities; c) persons who properly execute and file a timely request for exclusion from the Class; d) the legal representatives, successors or assigns of any such excluded persons; and e) all persons who have previously had claims finally adjudicated or who have released their claims against Defendant similar to those alleged herein.

123.    While the exact number and identities of the Class Members are unknown at this time, on information and belief, the Class is so numerous that joinder of all Class Members is impracticable.

124.    Defendant's wrongful conduct affected all of the Class Members in the same way, including but not limited to:

a) Alliance induced Land Interest Holders to enter into the Easements by falsely representing that all Land Interest Holders would be paid under the Crop Loss Program as long as the Pipeline was on their respective properties and they suffered crop yield losses;

b) Alliance breached its obligations under the Easements; and

c) Alliance breached its obligations under the AIMAs.

125.    Questions of law and fact common to all Plaintiffs and Class Members predominate over any questions affecting only individual Class Members including, without limitation:

a.      Whether Alliance induced Land Interest Holders to enter into the Easements by falsely representing that all Land Interest Holders would be paid for crop yield losses for as long as they occurred and Land Interest Holders could substantiate them;

b.      Whether Alliance breached its duties under the Easements and/or AIMAs; and

c.      Whether Alliance is required to compensate Plaintiffs and all Class Members for past and ongoing crop yield losses.

126.    The law of contract and nuisance is sufficiently similar in all four states as to avoid any conflict of law issues among Class Members located in different states.

127.    Plaintiffs' claims are typical of the claims of all Class Members because such claims arise from Alliance's wrongful conduct, as alleged above, pertaining to Plaintiffs' and Class Members' ongoing and uncompensated crop yield loss. The same damage calculation or formula for crop losses will be used for Plaintiffs and all Class Members. The same set of facts applies to Plaintiffs and all Class Members for the determination of liability. Proof of liability based on the Easements will be the same for

Plaintiffs and all Class Members. Plaintiffs have no interests antagonistic to the interests of the other Class Members.

128.    Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs have retained competent counsel experienced in complex litigation and class actions to represent themselves and the Class.

129.    This class action also provides a fair and efficient method for adjudicating the claims of Plaintiffs and all Class Members for the following reasons:

a.    common questions of law and fact predominate over any question affecting any individual Class Member;

b.    the prosecution of separate actions by individual Class Members would likely create a risk of inconsistent or varying adjudications with respect to individual Class Members, thereby creating inconsistent standards of conduct for Alliance that could adversely affect the ability of other Class Members to protect their interests;

c.    Alliance has acted or refused to act on grounds that apply generally to the Class, and final declaratory relief is appropriate respecting the Class as a whole;

d.    Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and

e.    the Class is readily definable and prosecution as a class action will eliminate the possibility of repetitious litigation while also providing redress for claims that may be too small to support the expense of individual, complex litigation.

130.    For these reasons, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Certification, therefore, is appropriate under Rule 23 of the Federal Rules of Civil Procedure.

## COUNT I – BREACH OF CONTRACT

131.    Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 130 above by this reference as if fully set forth herein.

132.    Alliance entered into a written easement agreement with each Plaintiff and Class Member prior to the construction of the Pipeline.

133.    In the Easements, Alliance agreed to pay for damages, including damage "to crops, pasture, fences, drainage tile, structures and timber which may arise from the laying, constructing, maintaining, operating, repairing, replacing or removing of the said pipeline." H & T Fair Hills Easements, Exs. 4-5.

134.    The terms and conditions of the AIMAs were incorporated into the Easements in Iowa, Minnesota, North Dakota and Illinois. *See* Iowa and Minnesota AIMA, Ex. 1, Condition F ("The provisions and requirements of this Agreement shall be deemed to be included in all easements unless the easement specifically provides to the contrary."); North Dakota AIMA, Ex. 2, Conditions Preamble; Illinois AIMA, Ex. 3, Conditions Preamble; *see also* Ruebel Easements, Exs. 6-7.

135.    The Easements, by incorporating the AIMAs, require Alliance to compensate Plaintiffs and Class Members for "damages, losses or inconvenience caused by [Alliance] which occurred on or off the Pipeline Right-of-Way associated with construction, installation, operation, maintenance and existence of the Pipeline." Iowa

and Minnesota AIMA, Ex. 1, ¶ 22; *see also*, North Dakota AIMA, Ex. 2, ¶ 8(B) (Alliance "will reasonably compensate Landowners and/or Tenants beyond the initial construction of the Pipeline to include those damages caused by the Company during future construction, operation [and] maintenance . . ."); Illinois AIMA, Ex. 3, ¶ 10(B) (same).

136.    The Easements do not place any time restriction on these obligations. Rather, Alliance's payment obligations are continuing. *See, e.g.*, Zimmerman Easements, Exs. 4-5; Ruebel Easements, Exs. 6-7; H & T Fair Hills Easements, Exs. 8-9; Wherry Easement, Ex. 10.

137.    Plaintiffs and all Class Members have suffered and continue to suffer crop yield losses as a result of the "construction, installation, operation, maintenance and existence" of the Pipeline.

138.    For the duration of the Crop Loss Program, Alliance used a USDA crop price that was less than the actual market price Plaintiffs and Class Members received when selling their crops, thus failing to adequately compensate Plaintiffs and Class Members for Easement Land crop yield losses. Alliance did not compensate Plaintiffs and Class Members for Adjacent Land crop yield losses at all.

139.    Alliance has refused to compensate Plaintiffs and Class Members for crop yield losses sustained after 2014.

140.    Pursuant to the Easements, Plaintiffs and Class Members are entitled to all past and future compensatory and consequential damages, prejudgment and post-judgment interest, costs and any other further relief this Court deems equitable, just, and proper.

## COUNT II – NUISANCE

141.     Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 140 above as if fully set forth herein.

142.     As discussed above, Alliance failed to construct the Pipeline in accordance with the AIMAs by failing to bury the Pipeline to the required depth, and by failing to follow the process by which Alliance was to backfill topsoil.

143.     As a result of this failure, the Pipeline emanates excessive heat beyond Easement Land and into Adjacent Land.

144.     As a result of this excessive heat, Adjacent Land, like Easement Land, does not freeze in the winter. Instead, Adjacent Land is also soggy for the entirety of the winter.

145.     Similar to Easement Land,  Adjacent Land does not adequately drain in the spring, and suffers from permanent crop yield losses.

146.     This invasion of heat from the Pipeline, which is constructed on land in which Alliance has an interest, to Adjacent Land, in which Alliance does not have an interest, interferes with Plaintiffs' and Class Members' use and enjoyment of Adjacent Land.

147.     Plaintiffs' and Class Members' loss of use and enjoyment is quantified by the permanent crop yield losses on Adjacent Land.

148.     Plaintiffs are entitled to all past and future compensatory damages, prejudgment and post-judgment interest, costs and any other relief the Court deems equitable, just and proper.

## COUNT III –  FRAUDULENT INDUCEMENT

149.   Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 148 above as if fully set forth herein.

150.   Alliance agents represented to each Plaintiff and Class Member that Alliance would pay for crop yield losses for as long as crop yield losses occurred and Plaintiffs and Class Members could substantiate them.

151.   At the time Alliance was negotiating terms of the Easements with Plaintiffs and Class Members, Alliance agents either knew Alliance would not pay for crop yield losses for as long as crop yield losses occurred and could be substantiated, or stated that Alliance would pay for crop yield losses for as long as they occurred and could be substantiated with reckless disregard for the truthfulness of those representations.

152.   Plaintiffs and Class Members relied on Alliance's representations that it would pay for crop yield losses for as long as they occurred and could be substantiated when Plaintiffs and Class Members executed the Easements.

153.   But for Alliance's representations that Alliance would pay for crop yield losses for as long as they occurred and could be substantiated, Plaintiffs and Class Members would not have agreed to the Easements.

154.   Plaintiffs and Class Members were fraudulently induced into entering into the Easements in reliance on the representations by Alliance's agents that Alliance would pay for crop yield losses for as long as they occurred and could be substantiated.

155.   Plaintiffs and Class Members could not have known Alliance's representations that Alliance would pay for crop losses for as long as they occurred and

could be substantiated were fraudulent until Alliance unilaterally terminated the Crop Loss Program in 2015.

156.   As a result of Alliance's fraudulent misrepresentations, Plaintiffs and all Class Members were damaged in the amount of their uncompensated past crop yield losses, and will continue to be damaged in the future for as long as the Pipeline is in operation.

<u>**COUNT IV – DECLARATORY JUDGMENT**</u>

157.   28 U.S.C. § 2201 provides that a federal district court may, in the case properly within its jurisdiction, declare the rights of any interested party upon request.

158.   Plaintiffs and Class Members request a declaratory judgment interpreting the Easements and AIMA's to require the ongoing payment of crop yield loss damages starting from the 2015 cancellation of the Crop Loss Program, and continuing for the operational life of the Pipeline.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all other similarly situated Class Members, respectfully request that this Court:

A.   Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiffs as representatives of the Class, and appoint Plaintiffs' counsel as Class Counsel;

B.   Enter judgment in favor of Plaintiffs and the Class against Defendant under the legal theories alleged herein;

C.   Award equitable relief or damages, in an amount to be determined by the trier of fact;

36

D.      Award attorneys' fees, expenses and costs of suit;

E.      Award pre-judgment and post-judgment interest at the maximum rate

allowed by law; and

F.      Such other and further relief as to this Court may deem necessary, just and

proper.

<h3 style="text-align:center"><u>JURY TRIAL DEMANDED</u></h3>

Plaintiffs respectfully demand a trial by jury on all the claims and causes of action

so triable.

Dated: April 23, 2019                    **HELLMUTH & JOHNSON, PLLC**

By: /s/ Michael R. Cashman
    Michael R. Cashman (MN #206945)
    Richard M. Hagstrom (MN #39445)
    Anne T. Regan (MN #333852)
    Michael P. Srodoski (MN #398250)
    8050 West 78th Street
    Edina, Minnesota  55439
    Telephone: (952) 941-4005
    Facsimile:  (952) 941-2337
    Email: mcashman@hjlawfirm.com
    Email: rhagstrom@hjlawfirm.com
    Email: aregan@hjlawfirm.com
    Email: msrodoski@hjlawfirm.com

**BALL & McCANN, P.C.**

Drew R. Ball
(*To Be Admitted Pro Hac Vice*)
Steve McCann
(*To Be Admitted Pro Hac Vice*)
161 North Clark Street, Suite 1600
Chicago, IL 60601
Telephone:  (872) 205.6556
E-mail:  Drew@BallMcCannLaw.com
E-mail:  Steve@BallMcCannLaw.com

**ATTORNEYS FOR PLAINTIFFS AND
PROPOSED CLASS**