UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

H & T Fair Hills, Ltd., Norman
Zimmerman, Donna Zimmerman, Steven
Wherry, Valerie Wherry, Robert Ruebel,
Mary Ruebel, Larry Ruebel, Mark Hein,
Debra Hein, and Nicholas Hein on behalf
of themselves and all others similarly
situated,

       Plaintiffs,

v.

       Case No. 19-cv-1095 (JNE/BRT)
       ORDER

Alliance Pipeline L.P. a/k/a Alliance
USA,

       Defendant.

Agricultural landowners brought this case against Alliance Pipeline for its alleged failure to compensate them for crop losses caused by a pipeline it built through their properties. Prior to construction, Defendant agreed to compensate these farmers for pipeline-related crop losses. Defendant met this obligation by creating a crop loss program that compensated landowners and tenants for lower crop yields on the pipeline right of way. In 2015, Defendant ended this program and, in 2019, Plaintiffs sued.

The Court dismissed Plaintiffs' claim for fraudulent inducement and claims for breach of contract and nuisance that accrued outside the statute of limitations. Seeking to represent other agricultural landowners and tenant farmers, Plaintiffs have now moved under Federal Rule of Civil Procedure 23 to certify a class for their breach of contract and declaratory judgment claims. For the reasons discussed below, the motion is granted.

1

# BACKGROUND

The Alliance Pipeline is a natural gas pipeline that runs from Canada to Illinois through North Dakota, Minnesota, and Iowa. Defendant constructed the pipeline in 1999 after obtaining approval from the Federal Energy Regulatory Commission ("FERC"). See *Alliance Pipeline L.P.*, 84 FERC 61,239, 62,209 (1998) (hereinafter "FERC Order"). Prior to FERC approval, Defendant had reached Agricultural Impact Mitigation Agreements ("AIMAs") with the attorneys general of the states crossed by the pipeline. Iowa and Minnesota entered into a joint agreement while North Dakota and Illinois each reached separate agreements with Defendant. Although the AIMAs contain different language, each provides for compensation to landowners for crop losses caused by the pipeline.

The North Dakota AIMA contains the following provision:

> The Company will reasonably compensate Landowners and/or Tenants for damages to private property caused by the Company beyond the initial construction of the Pipeline, to include those damages caused by the Company during future construction, operation, maintenance, and repairs relating to the Pipeline. . . . Such Damages may include but are not limited to loss of crops, pasture, timber, trees, produce, livestock, fences, irrigation systems or equipment.

Decl. of Anne T. Regan ("Regan Decl.") Ex. AA ("ND AIMA") ¶¶ 8.B, 8.C. The Minnesota and Iowa agreement reads:

> The Company shall reasonably compensate Landowners and/or Tenants for damages, losses or inconvenience caused by the Company which occurred on or off the Pipeline Right-of-Way associated with construction, installation, operation, maintenance and existence of the Pipeline. These damages, losses or inconveniences may include but are not limited to loss of crops, pasture, timber, trees, produce, livestock, fences, drain Tiles, irrigation systems or equipment.

*Id.* Ex. CC ("IA/MN AIMA") ¶ 22. The Illinois AIMA contains similar language but does not specifically list crop loss as an example:

> The Company will reasonably compensate Landowners for damages to private property caused by the Company beyond the initial construction of the pipeline, to include those damages caused by the Company during future construction, operation, maintenance, and repairs relating to the pipeline.

*Id.* Ex. BB ("IL AIMA") ¶ 10.B. The preamble to each agreement notes that mitigation measures "will serve to minimize the negative agricultural impacts that may occur due to pipeline construction." IL AIMA at 1; ND AIMA at 1; *see* IA/MN AIMA at 1 ("These measures are intended to mitigate, or provide compensation for, negative agricultural impacts that may occur due to Pipeline construction.").

After negotiating the AIMAs, Defendant obtained easements for the pipeline from private landowners through negotiations and condemnation proceedings. Decl. of Kenneth Goulart ("Goulart Decl.") ¶ 10. Defendant contacted landowners and tenants by mail, offering to pay two years of damages for construction and writing: "Alliance also agrees to pay additional damages which you can prove by your yields for subsequent years past the original two (2) years of damages." Regan Decl. Ex. EE. Using templates that incorporated language specific to the applicable AIMA, Defendant negotiated changes to the standard easement with some landowners. Goulart Decl. ¶ 11. Some differences relate to construction-specific activities or to site-specific issues, such as an additional easement for an access road to a pipeline valve site. *Id.* ¶ 11.b.

The standard easements discuss crop loss payments, although the language varies slightly between states. For example, in some Iowa easements, Defendant agreed "to pay

for damages to crops, pasture, fences, drainage tile, structures and timber which may arise from the laying, constructing, maintaining, operating, repairing, replacing or removing of the said pipeline." Regan Decl. Exs. B, C, D, E, F ("Iowa Easements") ¶ 3; Goulart Decl. Ex. D at 0012. Some Minnesota easements contain more detail and incorporate the AIMA:

> [Defendant] agrees to pay for any other damages to crops, pastures, fences, drainage tile, structures, timber, trees and shrubbery, which may arise from the surveying, laying, constructing, inspecting, maintaining, operating, repairing, altering, removing or abandoning in place of the said pipeline . . . . Such payment shall be made according to the provisions of the Mitigation Agreement, unless specifically agreed to otherwise in this Agreement and/or in the Special Provisions.

Regan Decl. Exs. G, H ("Minnesota Easements") ¶ 4.

In some Illinois easements, Defendant agreed "to pay for damages to crops, pasture, fences, roadway structures and timber which may arise from the laying, constructing, maintaining, operating, repairing, replacing or removing of the said pipeline." Regan Decl. Ex. J ("Illinois Easement") ¶ 3. The North Dakota easements have nearly identical language: "[Defendant] shall pay for damages to crops, pasture, fences, structures, and timber which may arise from the laying, constructing, maintaining, operating, repairing, replacing or removing of the said pipeline." Regan Decl. Exs. K, L ("North Dakota Easements") ¶ 3.

Some easements contain language that discusses arbitration as the mechanism by which crop loss damages are determined. For example, according to one easement:

> Said damages, if not mutually agreed upon, shall be determined by arbitration before three (3) disinterested persons, having appropriate experience and expertise, one to be appointed by Grantor, one appointed by Grantee, and a third

appointed by the two appointed persons, and the award of the three (3) persons shall be final and conclusive.

Illinois Easement ¶ 3; *see, e.g.*, Goulart Decl. Ex. E at 0006. Defendant's former employee,[1] Kenneth Goulart, testified that 1,798 out of 2,457 easements contain these arbitration provisions. Goulart Decl. ¶¶ 12–13.

Prior to pipeline construction, FERC conducted an environmental review and prepared an Environmental Impact Statement ("EIS") that evaluated the potential effects of the pipeline, including effects on agricultural land. FERC Order at 62,215. The EIS noted: "Agricultural productivity could be affected by a number of factors associated with pipeline construction, including compaction, soil mixing, changes in physical and chemical soil characteristics, drainage, local climatic conditions, inherent soil productivity, and individual management practices." *See* Regan Decl. Ex. LL ("EIS") at 5-13. The EIS concluded that with the mitigation strategies required by the EIS and the AIMAs, "the long-term potential productivity of farmland traversed by the pipeline would not be adversely affected." *Id.* at 5-14.

The EIS noted that although it was unclear whether higher soil temperatures around the pipeline would negatively affect crop yields, "Alliance would provide compensation for adverse effects attributed to increased soil temperatures." *Id.* Plaintiffs' expert soil scientist, Shannon Gomes, testified that the pipeline caused an injury to the

---

[1] Although Mr. Goulart no longer works for Alliance Pipeline, he is currently employed by Enbridge, Inc, which began managing pipeline operations in 2018. Goulart Decl. ¶¶ 1, 3. The Alliance Pipeline is a joint venture between Enbridge and Pembina Pipeline Corporation. *Id.* ¶ 3.

soil along the entire pipeline that will persist for decades, regardless of differences in soil type or location. Decl. of Shannon Gomes ("Gomes Decl.") ¶¶ 19–20. According to Gomes, Defendant's own study concluded that crop losses continued despite the mitigation efforts implemented. *Id.* ¶ 30. Defendant's expert soil scientist, Dr. James Arndt, opined that there are many different soil types along the pipeline and, therefore, crop yields may be affected differently by the pipeline. Decl. of Dr. James Arndt ("Arndt Decl.") ¶¶ 22–24. He wrote that county or state averages of aggregate yields could not be used to determine yields on a specific field. *Id.* ¶ 23.

Defendant also submitted opinions of agronomist Aaron DeJoia that largely corroborated the opinions of Dr. Arndt. *See* Decl. of Aaron DeJoia ("DeJoia Decl.") ¶ 1. Mr. DeJoia wrote that "it is not scientifically sound to assess the extent to which the Pipeline has impacted or continues to impact crop yields without conducting an assessment of each specific parcel." *Id.* ¶ 7. He also concluded that if there is a lower crop yield on the pipeline right of way, a "parcel-specific analysis would be required to determine whether the Pipeline could be identified as a cause of any such differentials and, if so, to what degree." *Id.* ¶ 8. Based on his review of Defendant's crop loss database, he wrote that he would not be able to create any sort of workable model of crop loss. *Id.* ¶ 34.

During the crop loss program, Defendant calculated crop loss payments by measuring the yield on the pipeline right of way and comparing it to the yield on the same field off the right of way. *Id.* ¶ 33. If there was a lower yield on the right of way, it would pay the landowner for the difference. *Id.* Mr. Goulart testified that only about

twenty to twenty-five percent of landowners participated in the program. Goulart Decl. ¶ 40. For several years, Defendant hired agronomists to conduct the measurements. *Id.* ¶ 32. In 2012, Defendant stopped providing agronomists and required landowners to absorb any costs of conducting crop yield assessments. Regan Decl. Ex. W. In a 2015 letter, Defendant terminated its crop loss program, but noted that "termination of the voluntary program does not end Alliance's commitment and obligation to reimburse for any damages that you may incur as the result of operational activity that Alliance will still be performing from time to time." Regan Decl. Ex. S.

Throughout the crop loss program, Defendant collected crop loss information in a database now known as LandScribe. Goulart Decl. ¶ 49. The database "includes the names and addresses of known landowners and tenants." *Id.* ¶ 51. Defendant obtained that information when it acquired easements for the pipeline and conducted title research. *Id.* As it became aware of changes in land ownership, it would update that information in the database. *Id.* Mr. Goulart explained that the database was a customer management system, *id.* ¶ 50, and although it records some crop loss data, it could not be used to make reliable calculations of crop loss, *id.* ¶ 71.

Three of the proposed class representatives are Mark, Debra, and their son Nicholas Hein. They own a farm company, H & T Fair Hills. Decl. of Nicholas Hein ¶ 4. The Heins owned three parcels in Iowa prior to the pipeline's construction. *Id.* Now, they lease the land to H & T Fair Hills to farm the parcels through a verbal agreement. Decl. of Nicole Moen ("Moen Decl.") Ex. 8 ("Mark Hein Dep.") 32:7–25. Nicholas Hein

purchased a fourth tract crossed by the pipeline in 2006 and leases it to H & T Fair Hills for farming. Moen Decl. Ex. 4 ("Nicholas Hein Dep.") 17:7–14.

Robert, Mary, and Larry Ruebel are siblings who own two pipeline tracts in Minnesota. Moen Decl. Ex. 12 ("Robert Ruebel Dep.") 57:1–5. They rent the land to tenants for farming and divide the proceeds equally. *Id.* 71:13, 101:2–4. The siblings pay Robert to manage the properties and he handles matters related to the pipeline. *Id.* 102:2–16, 115:18–23, 117:2–3. Robert previously received crop yield payments from Defendant and kept the payments as the property manager. *Id.* 155:22.

Norman and Donna Zimmerman owned two tracts in Iowa prior to the pipeline's construction. Moen Decl. Ex. 6 ("Norman Zimmerman Dep.") 62:7–10. Mr. Zimmerman manages the farm, *id.* 25:2–5, and Ms. Zimmerman does not. Moen Decl. Ex. 13 ("Donna Zimmerman Dep.") 25:17–20.

Steven and Valerie Wherry own two tracts in Iowa. Moen Decl. Ex. 7 ("Steven Wherry Dep.") 15:15–17. They owned one tract prior to pipeline construction, purchased a second tract after construction, *id.* 21:1–6, and currently rent a third parcel with pipeline right of way, *id.* 23:1–8. Mr. Wherry manages the farm and Ms. Wherry does not. Moen Decl. Ex. 14 ("Valerie Wherry Dep.") 17:11–12.

## DISCUSSION

### I.  Motion to Strike

After briefing on class certification was completed, Defendant filed a motion to strike portions of Plaintiffs' reply brief and its supporting affidavits. Courts in this district have observed that "there is no such thing as a 'motion to strike'—at least when the paper

being targeted is a memorandum or affidavit submitted in connection with a dispositive motion." *Portz v. St. Cloud St. Univ.*, 297 F. Supp. 3d 929, 950 (D. Minn. 2018) (internal alterations omitted) (quoting *Carlson Mktg. Grp., Inc. v. Royal Indem. Co.*, Civil No. 04–CV–3368, 2006 WL 2917173, at *2 (D. Minn. Oct. 11, 2006)). The motion to strike is denied.

Local Rule 7.1(c)(3)(B) prohibits parties from using a reply memorandum to "raise new grounds for relief or present matters that do not relate to the opposing party's response." If a party raises new arguments in a reply brief, thus depriving the other side of an ability to respond, the court can disregard those arguments. *See, e.g.*, *Zellner-Dion v. Wilmington Fin., Inc.*, No. 10–CV-2587 (PJS/JSM), 2012 WL 2952251, at *1 n.1 (D. Minn. July 19, 2012). Defendant argues that the court should disregard portions of the reply brief and its supporting declarations. As discussed below, Plaintiffs can meet their burden under Rule 23 without any new arguments or additional declarations. Therefore, the Court will assume without deciding that it cannot consider that information on this motion and offers no opinion about whether the evidence may be used for other purposes in this litigation.

## II.    Class Certification

Plaintiffs have moved to certify the following class on their breach of contract claim under Rule 23(b)(3) and on their declaratory judgment claim under Rule 23(b)(2):

> All persons or entities who held or hold a land interest on Defendant's Pipeline Right of Way and who, since 2014, were or are eligible for crop loss compensation pursuant to Easements or Agricultural Impact Mitigation Agreements.

To certify either class, Plaintiffs must meet the prerequisites of Rule 23(a) after a "rigorous analysis." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

### a. Rule 23(a): Prerequisites

Rule 23(a) establishes four prerequisites to a class action:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Additionally, the Eighth Circuit considers an "implicit requirement that a class 'must be adequately defined and clearly ascertainable.'" *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017) (per curiam) (quoting *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016)).

### 1. Ascertainability

"A class may be ascertainable when its members may be identified by reference to objective criteria." *McKeage*, 847 F.3d at 998. "Ascertainability does not require that a plaintiff must be able to identify all class members at the time of class certification; rather, a plaintiff need only show that class members can be identified." *Planned Parenthood Ark. & E. Okla. v. Selig*, 313 F.R.D. 81, 92 (E.D. Ark. 2016). Plaintiffs argue that the class members are identifiable through Defendant's records and its LandScribe database. Defendant argues that because the database does not contain current information about land ownership and tenancy, the class is not ascertainable. It argues that the Court would need to conduct a title search for each parcel to determine

ownership. Because many of the farming lease agreements are oral, Defendant argues that tenants would only be ascertainable through conversations with each landowner.

Defendant holds easements on each parcel that could give rise to a crop loss claim. The objective criteria that can be used to identify each class member include the easement agreement, the land title, and other property records. While there may be some challenges in determining current land ownership and lease rights, that does not mean the class cannot be ascertained. For example, in *Sandusky Wellness Center*, despite challenges in identifying who would be entitled to damages for receiving unauthorized faxes, the court held that fax numbers were "objective criteria that make the recipient clearly ascertainable." 821 F.3d at 997. Like the fax numbers, Defendant's property records contain objective criteria that can be used to identify class members. For properties that have had ownership changes, the class members are ascertainable because they own or rent the property and can submit documentation to verify their legal interest in the property. *See, e.g.*, *Barfield v. Sho-Me Power Elec. Coop.*, 852 F.3d 795, 805–06 (8th Cir. 2017) (affirming certification of a class of landowners where the class members would file "a sworn statement identifying the period of their ownership and attaching a deed").

### 2. Numerosity

Defendant entered into thousands of easements along this pipeline. Defendant does not dispute the numerosity requirement and Plaintiffs' proposed class satisfies it in this case. *See* Fed. R. Civ. P. 23(a)(1).

### 3. Commonality

The commonality requirement in Rule 23(a)(2) requires questions common to the class that show "that the class members 'have suffered the same injury.'" *Wal-Mart Stores*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 157 (1982)). The common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. Cases involving form contracts are generally well-suited to class action treatment. *See McKeage*, 847 F.3d at 999 (citing *Flanagan v. Allstate Ins. Co.*, 242 F.R.D. 421, 428 (N.D. Ill. 2007) ("Claims arising out of form contracts are particularly appropriate for class action treatment.")).

When analyzing Rule 23(a), "even a single common question will do." *Wal-Mart Stores*, 564 U.S. at 359. Here, there are common questions that can be efficiently resolved on a class-wide basis. For example, does Defendant have a contractual obligation, under the easements and AIMAs, to compensate landowners for crop loss on the pipeline right of way? Because the four AIMAs contain materially similar language with respect to crop loss, the answer to this question will be the same for the entire class. The material terms of the easements also appear to be similar. Although Defendant argues that the easements are not uniform, it has not shown any example of material differences that pertain to crop loss.

Whether Defendant breached its obligations is another question that can be resolved on a class-wide basis. Plaintiffs contend that Defendant breached its contractual

duty to pay for crop loss when it terminated the crop loss program by sending a letter to all class members. According to Plaintiffs, Defendant's program termination letter demonstrates that Defendant would not pay for ongoing crop losses. Although Defendant disagrees with this claim on the merits, that does not preclude class certification because the dispute can be resolved in a manner common to the class.

Plaintiffs have identified common questions that will generate answers common to the class and have satisfied Rule 23(a)(2).

### 4. Typicality

"Typicality 'is fairly easily met so long as other class members have claims similar to the named plaintiff.'" *Postawko v. Mo. Dept. of Corr.*, 910 F.3d 1030, 1039 (8th Cir. 2018) (quoting *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995)). "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Id.* (quoting *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996)). A class representative who suffered an injury typical to the class can meet this requirement even if the amount of damages differs among class members. *See Mund v. EMCC, Inc.*, 259 F.R.D. 180, 184 (D. Minn. 2009).

Here, each Plaintiff has an interest in pipeline property and is the beneficiary of an easement and AIMA. Each grows crops or leases the property for growing crops. While the amount of crop loss damages will vary among class members, Plaintiffs are

representative of the class because they each have a breach of contract claim against Defendant for any crop loss caused by the pipeline that occurred within the class period.

Defendant argues that although class members have a common legal theory, individualized issues will defeat typicality because "a common legal theory does not establish typicality when proof of a violation requires individualized inquiry." *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006). The plaintiffs in *Elizabeth M.* alleged that they were assaulted by employees at state mental health facilities. *Id.* at 786–87. Determining if each class member was assaulted, and if the circumstances of those assaults violated constitutional substantive due process, was a highly individualized inquiry because "[a] substantive due process claim invariably 'demands an exact analysis of circumstances before any abuse of power is condemned.'" *Id.* at 787 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)).

Defendant argues that the claims here similarly require highly individualized inquiries because class members cannot prove a breach claim unless there is proven crop loss caused by the pipeline for each class member. But here, Plaintiffs allege that Defendant breached its contractual obligations through the same termination letter for all landowners and that it refuses to pay for any crop loss. These claims are typical of the class because, unlike the allegations in *Elizabeth M.*, they arise from the same set of factual circumstances and the same legal theory. *See Postawko*, 910 F.3d at 1039.

Defendant also argues that Plaintiffs are not typical because many of the proposed class members are bound by arbitration provisions contained in easements and Plaintiffs are not. In the case cited by Defendant, the proposed class representative had already

arbitrated claims. *S & S Forage & Equip. Co., Inc. v. Up N. Plastics, Inc.*, No. Civ. 98–565 (JRT/RLE), 2002 WL 31718409, at *3 (D. Minn. Nov. 21, 2002). Here, by contrast, the proposed class representatives have not adjudicated their claims in arbitration. The parties dispute whether the easement arbitration language applies only to damages or would apply to any dispute that arises out of the contract. In any event, the AIMAs contain no arbitration language. Therefore, the Court need not resolve this merits issue at this stage because, at the very least, Plaintiffs' claims are typical of claims that arise under the AIMAs.

### 5. Adequacy

Rule 23(a)(4) requires the Court to consider "whether the named representatives (1) 'have common interests with the members of the class;' and (2) 'will vigorously prosecute the interests of the class through qualified counsel.'" *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 613 (8th Cir. 2017) (quoting *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 562–63 (8th Cir. 1982)). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Defendant argues that the interests of tenants and landowners are at odds because Plaintiffs have not defined how damages will be apportioned between them. Defendant compares this case to a wage and hour case where some class members would have been rewarded at the expense of others. *See Delsing v. Starbucks Coffee Corp.*, No. 08–CV–1154 (PJS/JSM), 2009 WL 3202378, at *3 (D. Minn. Sept. 30, 2009). In *Delsing*, baristas challenged a Starbucks policy that pooled all weekly tips and redistributed them equally

among all service-facing employees based on hours worked. *Id.* This policy took tips from employees who worked shifts with more tips and gave them to employees who worked shifts with fewer tips. *Id.* Because the interests of these groups were antagonistic, the court denied class certification on adequacy grounds. *Id.* This case is unlike *Delsing* because Plaintiffs are not challenging a redistribution policy, where money was taken from one group of class members and given to another group. Here, Plaintiffs are challenging Defendant's alleged failure to pay for crop loss. The apportionment of crop loss compensation is a collateral issue determined by the lease agreement between the landowner and tenant. Whoever has a legal right to crop loss compensation for a particular property, whether landowner or tenant, stands to benefit from this case.

Next, Defendant argues that Norman Zimmerman and Nicholas Hein destroyed evidence and are inadequate class representatives. *See, e.g.*, *Falcon v. Philips Elecs. N. Am. Corp.*, 304 F. App'x 896, 897 (2d Cir. 2008) (per curiam) (affirming decision not to appoint a class representative who would be preoccupied defending her husband's spoliation of evidence); *Pagan v. Abbott Labs., Inc.*, 287 F.R.D. 139, 150 (E.D.N.Y. 2012) (named plaintiff's alleged spoliation was a unique issue that would distract from class representation). Although Defendant previously moved for sanctions for alleged spoliation by Mr. Zimmerman, the matter was resolved by the parties. *See* Stipulation, ECF No. 109. Unlike in the cases cited by Defendant, there is no active claim of spoliation that would distract Mr. Zimmerman from representing the interests of the class.

Defendant also alleges that Nicholas Hein engaged in spoliation by destroying handwritten notes he took of a 2019 crop assessment, which he later transcribed to an

invoice. Nicholas Hein Dep. 235:3–239:12. The invoice was produced to Defendant, but the handwritten notes were not. Moen Decl. Ex. 17 at 6–7. Here, Defendant has not moved for sanctions and the relevant data was apparently transcribed. This does not make Nicholas Hein an inadequate representative.

Defendant argues that the Plaintiffs have abdicated their responsibilities because they do not know exactly how damages will be determined and allocated. It argues that the Plaintiffs' memories are fuzzy about details related to farming practices, yields, and rental agreements. These arguments are based on a few responses to specific deposition questions and are not grounds for inadequacy here.

A few proposed class representatives do not appear to have knowledge of the agricultural operations on their land. *See* Debra Hein Dep. 24:8–25 (explaining that she is not involved in decision-making about crop sales or land management); Donna Zimmerman Dep. 25:14–25 (explaining that she is not involved in management of the farm); Valerie Wherry Dep. 17:8–25 (explaining that her husband manages the farm); Mary Ruebel Dep. 26:9–11 (explaining that her brother, Robert, manages the farm); Larry Ruebel Dep. 31:19–21 (explaining that his brother manages the farm). While these Plaintiffs have ownership interests in the land, it appears that they would need to rely on family members to prosecute the case. Therefore, the Court will not certify Debra Hein, Donna Zimmerman, Valerie Wherry, Larry Ruebel, or Mary Ruebel as class representatives.

### b. Rule 23(b)(3): Predominance and Superiority

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Relevant factors to consider include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing the class action.

Fed. R. Civ. P. 23(b)(3). Rule 23 analysis "will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores*, 564 U.S. at 351. However, "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013). "The question at class certification is not whether the plaintiffs have already proven their claims through common evidence. Rather, it is whether questions of law or fact capable of resolution through common evidence predominate over individual questions." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 619 (8th Cir. 2011).

"An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized class-wide proof.'" *Tyson Foods, Inc. v.*

*Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50 (5th ed. 2012)). Certification is proper even if issues such as damages or affirmative defenses will need to be tried separately. *Id.*

### 1. Ownership Changes

Defendant contends that challenges in identifying property owners and tenants will overwhelm common issues. Defendant argues that because there is no centralized database that identifies all historical owners or tenants of a property, a title search would need to be conducted to find the landowner for every parcel and that a conversation with each landowner would be necessary to identify tenant farmers.

Other courts have managed similar issues in property cases during claims administration. For example, in *Barfield v. Sho-Me Power Elec. Coop.*, the court certified a class of landowners where notices could be sent to addresses associated with the properties at issue. No. 11–cv–4321–NKL, 2013 WL 3872181, at *14 (W.D. Mo. July 25, 2013), *affirmed* 852 F.3d 795 (8th Cir. 2017). The court noted that if a title search was onerous and expensive, it was "clearly not the best means practicable of providing notice." *Id.* (citing *Fisher v. Va. Elec. & Power Co.*, 217 F.R.D. 201, 227 (E.D. Va. 2003)). Class members submitted claims "with a sworn statement identifying the period of their ownership and attaching a deed." *Id.* at *15. The court explained: "In the event that individual issues involving damages or disputes between competing owners arise, this will be addressed in claims administration proceedings as between the competing owners." *Id.*

While identifying the beneficiaries of the contracts in question will be necessary to award any damages, those identification issues are not so onerous that they will predominate. The pipeline crosses a finite number of properties. Defendant knows where the pipeline is, has recorded addresses of the properties along the pipeline, and has access to the names and address of known landowners and tenants. Notice can be delivered to the addresses associated with each easement and class members could be required to submit documentation demonstrating their ownership interest in the pipeline land. Issues related to competing claims between landowners and tenants are issues of manageability that could be resolved in claims administration. *In re Workers' Comp.*, 130 F.R.D. 99, 110 (D. Minn. 1990) ("[D]ismissal for management reasons is never favored.").

## 2. Injury and Causation

Defendant argues that the class cannot be certified because it is akin to another Eighth Circuit pipeline case where individualized injury and causation issues predominated. In *Webb v. Exxon Mobil Corp.*, landowners sued Exxon for breaching easement contracts related to a pipeline that had been laid approximately 70 years prior. 856 F.3d 1150, 1153 (8th Cir. 2017). The plaintiffs alleged that Exxon "materially breached the terms of their easement contracts by failing to inspect, maintain, repair, and replace the pipeline, resulting in hazardous conditions and damages to the plaintiffs' servient estates." *Id.* at 1154. In the easements, the pipeline operator agreed to "pay any damages that may arise to crops, timber or fences" from the operation of the pipeline. *Id.* The district court decertified a class of landowners because it found that the pipeline was "comprised of individual segments," such that "Exxon's actions, or inactions, on one

individual's land would not necessarily implicate the interests of other landowners." *Id.* at 1156. The Eighth Circuit affirmed, finding that individual issues predominated because the injuries suffered by landowners along the pipeline differed by location. *Id.*

In *Webb*, the court noted that "establishing breach would require examination of how Exxon's operation of the pipeline affects the plaintiffs, which, as the district court found, varies depending on where individual class members' property is located, as well as many other factors." *Id.* at 1156. Additionally, considerations "unique to each class member's property" predominated over common issues. *Id.* at 1157. Defendant argues that *Webb* is controlling here because establishing whether a breach of the AIMAs or easements occurred requires a parcel-by-parcel analysis, due to the unique features of each property.

The nature of the breach of contract claim in this case is fundamentally different than *Webb* in three respects. First, Plaintiffs allege that they suffered a common injury through Defendant's decision to prospectively terminate crop loss payments in the 2015 termination letter. Unlike the types of injuries in *Webb*, determining whether this action constitutes a legal injury does not require individualized inquiries.[2] *Id.* at 1156. Whether Defendant breached its contractual obligations by stopping payments for crop loss is a question that can be answered for the entire class.

---

[2]     This case also differs from *Webb* because Plaintiffs only allege a single type of injury, crop loss, and not a variety of injury types. 856 F.3d at 1156–57; *see also Smith v. ConocoPhillips Pipe Line Co.*, 801 F.3d 921, 925–26 (8th Cir. 2015) (decertifying class with nuisance and negligence claims where the class members had not suffered the same injury).

Second, in *Webb*, whether the defendant owed implied duties of maintenance and repair was a question of state law that required separate analysis for each state crossed by the pipeline. *Id.* at 1158. Here, by contrast, the breach alleged pertains to an express contract term and Defendant has not identified any material conflict in contract law between the four states in this case.

Third, in *Webb*, determining if the pipeline was inadequately maintained on a particular segment was a highly individualized inquiry. *Id.* at 1156–57. By contrast, the contract term that Plaintiffs allege was breached is an obligation to pay for crop losses caused by the pipeline. Unlike implied duties of maintenance and repair, this duty does not necessarily require individualized inquiries to identify a breach. Whether individual inquiries will be required to prove a breach will depend, in part, on the causation standard that applies to the contracts. Defendant argues that each individual landowner must prove that any loss was specifically attributable to the pipeline and there were no other possible causes. Plaintiffs argue that Defendant did not require that level of proof during the crop loss program and that language such as "associated with" and "may arise from" indicates a relaxed causation standard. *See, e.g.*, *Huffington v. T.C. Grp., LLC*, 637 F.3d 18, 22 (1st Cir. 2011); *United States v. Bradford*, 433 F. Supp. 2d 1001, 1003 (N.D. Iowa 2006). This standard can be met, Plaintiffs argue, by identifying a lower yield on the pipeline right of way as compared to the rest of the same field. Defendant argues that this is not an appropriate method of proof because there may be variations in soil type within each field and other possible causes for lower yields.

Both the causation standard required by the contracts and the method of proof required to meet that standard are merits issues. Those issues can be resolved uniformly for the entire class because the contracts contain similar causation language. For example, the easements uniformly state that Defendant will pay damages "which may arise from" the pipeline. *See, e.g.*, Minnesota Easements ¶ 4; Illinois Easement ¶ 3; North Dakota Easements ¶ 3; Iowa Easements ¶ 3.[3] At this stage, individual issues of causation do not predominate over the common questions regarding Defendant's contractual obligations and the appropriate method of proof for determining pipeline-related losses.

### 3. Arbitration Agreements

Defendant argues that nearly three-quarters of the easements contain arbitration provisions that will require individualized determinations. Plaintiffs argue that this has no bearing on their claims under the AIMAs, which do not contain such provisions, and that Defendant has waived arbitration as a defense. Furthermore, Plaintiffs argue, the Eighth Circuit has found that nearly identical provisions are agreements to appraisement, not arbitration, because they only send the issue of damages, and not liability, to arbitration. *See Kleinheider v. Phillips Pipe Line Co.*, 528 F.2d 837, 843 (8th Cir. 1975).

Because the AIMAs contain no arbitration language, arbitration is not an issue that precludes class certification on the breach of contract claims arising under the AIMAs. The arbitration provisions appear to be identical among easements with such language.

---

[3] The AIMAs contain causation language in two different formulations. The Iowa/Minnesota AIMA states that Defendant will compensate landowners for damages "associated with" the pipeline. IA/MN AIMA ¶ 22. The North Dakota and Illinois AIMAs simply include "caused by" language. ND AIMA ¶ 8.B; IL AIMA ¶ 10.B.

Therefore, questions related the interpretation of those provisions will not be individualized and will not overwhelm the common questions related to the AIMAs.

### 4. Differences Between Contracts

Defendant argues that the AIMAs establish different topsoil requirements and that the easements contain unique provisions, making class treatment inappropriate. While Defendant correctly points out that the Eleventh Circuit has decertified a class due to variations in contract language, it did so because the variations were material to the claim at issue. *See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1171 (11th Cir. 2010). Here, the differences Defendant identified relate to pipeline construction, not post-construction crop loss. Those differences are not material to the questions in this case and, therefore, do not predominate.

### 5. Fail-Safe Class

Defendant argues that Plaintiffs have proposed an impermissible fail-safe class. A fail-safe class precludes membership unless a member prevails on the merits. *Orduno v. Pietrzak*, 932 F.3d 710, 716 (8th Cir. 2019). If members are only included in the class if they prevail, "it would allow putative class members to seek a remedy but not be bound by an adverse judgment—either those 'class members win or, by virtue of losing, they are not in the class' and are not bound." *Id.* (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012)). Defendant argues that by including only landowners and tenants "eligible" for compensation, the definition proposed excludes any person who cannot prove crop loss.

Plaintiffs have not proposed a fail-safe class because the word "eligible" in their class definition refers to individuals who have a claim for crop loss under the contracts:

> All persons or entities who held or hold a land interest on Defendant's Pipeline Right of Way and who, since 2014, were or are eligible for crop loss compensation pursuant to Easements or Agricultural Impact Mitigation Agreements.

Here, "eligible" only means that "pursuant to" an easement or AIMA, the class member can file a claim for crop loss, not that they can necessarily prove their claim. The definition excludes those who hold pipeline land interests but do not have a claim under the applicable contracts. *See Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 768 (8th Cir. 2020) (explaining that when a district court excluded people who did not share the legal claim at issue from a class definition, it was not creating a fail-safe class). For example, the definition excludes public entities and Alliance itself because, although they own pipeline right of way land, they are not eligible for compensation under an easement or AIMA. Anyone eligible for crop loss compensation under these agreements will be bound by an adverse judgment if they cannot prove their claim.

### 6. Damages

In *Comcast Corp. v. Behrend*, the Supreme Court reversed a class certification decision because the plaintiffs failed to tie their theory of antitrust liability to their proposed damages model. 569 U.S. 27, 36–37 (2013). The district court had certified a class on one theory out of four offered, but the plaintiffs had proposed a single damages model that did not differentiate between those theories. *Id.* at 36–37. The Eighth Circuit has noted that even if "there are individual inquiries" in determining each class member's damages, *Comcast* is satisfied as long as the damages model aligns with the theory of

liability. *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 833 (8th Cir. 2016); *accord In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014).

Plaintiffs proposed a damages model for the entire class, as established by Professor Gary Schnitkey, an agricultural economist. He proposed a class-wide damages calculation by using the Defendant's database of crop loss measurements taken between 2001 and 2014. *See* Schnitkey Decl. ¶¶ 9, 16. After calculating the average decreased yield percentage rates using Defendant's database, he multiplied that percentage by the number of acres "eligible for compensation times bushels per acre times prices." *Id.* ¶ 7. Defendant argues that this model is unreliable because the crop loss database is not a reliable source for these measurements.

In this case, Plaintiffs' theory of liability is that the contracts at issue make Defendant liable for crop yields that are lower on the pipeline right of way than on the rest of each field. They proposed a model for calculating damages that is based on the actual crop yield reduction as measured between 2001 to 2014. Because this model is tied to the theory of liability, it satisfies *Comcast*. *See Day*, 827 F.3d at 833. Whether that expert's model is credible and whether that "methodology will be successful in identifying uninjured class members is a question that, on this record, is premature." *Tyson Foods, Inc.*, 577 U.S. at 461.

### 7. Defenses

Defendant argues that its defenses require individualized determinations for each class member. It argues that Plaintiffs failed to mitigate damages and that some class members have released crop loss claims. Defendant bears the burden to prove its

defenses, which are subject to the same rigorous inquiry at the certification stage as Plaintiffs' claims. *In re Zurn Pex Plumbing Prods.*, 644 F.3d at 619.

First, Defendant suggests that individual landowners failed to mitigate damages. A failure to mitigate defense is typically not a liability defense, but a limitation on recoverable damages. *See* Restatement (Second) of Contracts § 350; *Snyder v. City of Minneapolis*, 441 N.W.2d 781, 790 (Minn. 1989). Based on the arguments presented thus far, this defense would not overwhelm the common questions of liability.

Next, Defendant argues that some class members released claims. A few putative class members appear to have released claims for crop loss between the years 2000 and 2020. *See, e.g.*, Goulart Decl. ¶ 28. Defendant identified one release and explained that "some landowners in Iowa" signed these releases. *Id.* Plaintiffs argue that there is a small universe of these releases and they can be excluded in claims administration. Because Defendant has only identified one specific release and describes releases in only one of the four states at issue, individual defenses related to releases do not predominate.

### 8. Superiority

Rule 23(b)(3) requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." A class action would be more efficient and less burdensome on the parties than thousands of individual lawsuits. The relevant contract language in the easements and AIMAs is materially similar. By dividing this case into multiple lawsuits, the parties could find themselves subject to conflicting judgments interpreting the same contractual language. Therefore, a class action would be the superior method of adjudication.

### c.  Rule 23(b)(2)

Plaintiffs seek to certify their declaratory judgment claim under Rule 23(b)(2), which applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." This rule "applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores*, 564 U.S. at 360. Although class claims under Rule 23(b)(2) do not need to meet the predominance standard of Rule 23(b)(3), they must be "cohesive." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1035 (8th Cir. 2010). "Indeed, cohesiveness is even more important for a Rule 23(b)(2) class because, unlike Rule 23(b)(3), there is no provision for unnamed class members to opt out of the litigation." *Id.*

Defendant argues that the proposed class here is not cohesive because of issues related to identifying class members, proving causation related to crop loss, and calculating damages. Plaintiffs argue that a declaratory judgment is essential to confirm Defendant's obligations under the easements and AIMAs. Here, Plaintiffs have satisfied Rule 23(b)(2). Determining what obligations flow from the contracts and whether Defendant's program termination letter breached the obligation to pay for crop losses are questions well-suited to resolution on a class-wide basis. Although the Court dismissed Plaintiffs' request for an injunction to restore the crop loss program, a declaratory judgment would be useful to clarify whether Defendant has an ongoing obligation to pay for crop loss.

# CONCLUSION

Accordingly, the Court certifies the following class under Rule 23(b)(3) for the breach of contract claim and Rule 23(b)(2) for the declaratory judgment claim:

> All persons or entities who held or hold a land interest on Defendant's Pipeline Right of Way and who, since 2014, were or are eligible for crop loss compensation pursuant to Easements or Agricultural Impact Mitigation Agreements.

For the same reasons that the Court finds Rule 23(a)'s typicality and adequacy requirements are satisfied, the Court appoints Nicholas Hein, Mark Hein, Robert Ruebel, Steven Wherry, and Norman Zimmerman as class representatives. The Court declines to appoint the other proposed representatives. The Court has found the factors in Rule 23(g)(1) to be satisfied and appoints Hellmuth & Johnson, PLLC and Ball & McCann, P.C. as class counsel.

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Plaintiffs' Motion for Class Certification and for Appointment of Class Representatives and Class Counsel [ECF No. 186], as modified in the conclusion of this order, is GRANTED.

2. The Court DIRECTS the parties to provide notice of the pendency of this action as required by Fed. R. Civ. P. 23(c)(2).

3. Defendant's Motion to Strike [ECF No. 258] is DENIED.

Dated: June 21, 2021

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge