UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

H&T Fair Hills, Ltd., Mark Hein,
Debra Hein, Nicholas Hein, Norman
Zimmerman, Donna Zimmerman, Steven
Wherry, Valerie Wherry, Robert Ruebel,
Mary Ruebel, and Larry Ruebel, on
behalf of themselves and all others
similarly situated,

              Plaintiffs,                         Case No. 19-cv-1095 (JNE/BRT)

v.                                     ORDER

Alliance Pipeline L.P. a/k/a Alliance
USA,

              Defendant.

       Plaintiffs—a class of agricultural landowners—allege that Defendant Alliance

Pipeline L.P. ("Alliance") has failed to fulfill promises to compensate them for crop

damage associated with Alliance's natural gas pipeline.  Alliance has moved to compel

arbitration and dismiss the claims of landowners who granted Alliance easements that,

according to Alliance, require that crop damage disputes be resolved through arbitration.[1]

For the reasons below, the Court will grant a stay of arbitrable issues as to class members

who are subject to arbitration agreements.

---

[1] Alliance's motion seeks a dismissal or stay pending arbitration, rather than an order directing certain class members to initiate arbitration against Alliance.  *See* ECF No. 300 at 36 ("If this Motion is granted . . . [then] to the extent [that Class Members who are subject to Arbitration Easements] desire to pursue them, they may expeditiously pursue their claims in arbitration."); 9 U.S.C. §§ 3–4.

# BACKGROUND

Defendant Alliance Pipeline L.P. operates a natural gas pipeline ("Pipeline") that crosses agricultural lands in North Dakota, Minnesota, Iowa, and Illinois. ECF No. 283 at 2. The Pipeline was built in the late 1990s with the approval of the Federal Energy Regulatory Commission ("FERC"). *Id.* The Pipeline entered service in 2000 and has since been in operation. Declaration of Kenneth Goulart, ECF No. 225 ¶ 6. Before receiving FERC approval, Alliance entered into Agricultural Impact Mitigation Agreements ("AIMAs") with officials representing the states crossed by the Pipeline. ECF No. 283 at 2. The AIMAs differ slightly in their language, but in all of the AIMAs, Alliance agreed to compensate landowners for crop losses caused by the Pipeline.

As relevant here, the North Dakota AIMA provides:

> The Company will reasonably compensate Landowners and/or Tenants for damages to private property caused by the Company beyond the initial construction of the Pipeline, to include those damages caused by the Company during future construction, operation, maintenance, and repairs relating to the Pipeline. . . . Such Damages may include but are not limited to loss of crops, pasture, timber, trees, produce, livestock, fences, irrigation system or equipment.

Declaration of Anne T. Regan, Ex. AA, ECF No. 199-19 ¶¶ 8.B–C. Iowa and Minnesota jointly entered an agreement with Alliance, which provides:

> The Company shall reasonably compensate Landowners and/or Tenants for damages, losses or inconvenience caused by the Company which occurred on or off the Pipeline Right-of-Way associated with construction, installation, operation, maintenance and existence of the Pipeline. These damages, losses or inconveniences may include but are not limited to loss of crops, pasture, timber, trees, produce, livestock, fences, drain Tiles, irrigation systems or equipment.

*Id.*, Ex. CC, ECF No. 199-21 ¶ 22. The Illinois AIMA provides:

2

> The Company will reasonably compensate Landowners for damages to
> private property caused by the Company beyond the initial construction of
> the pipeline, to include those damages caused by the Company during
> future construction, operation, maintenance, and repairs relating to the
> pipeline.

*Id.* Ex. BB, ECF No. 199-20 ¶ 10.B.

To build the Pipeline, Alliance obtained easements from private landowners through negotiations and condemnation proceedings. The easements vary slightly in their wording, but generally contain an agreement to pay for damages to crops (among other forms of damage) due to the construction and operation of the Pipeline. ECF No. 283 at 3–4. Roughly 73% of these easements state that crop damages, if disputed, will be determined by arbitration. ECF No. 225 ¶¶ 12–13; ECF No. 302-3. Such "arbitration easements" typically provide:

> The Grantee shall pay for damages to crops, pasture, fences, structures and
> timber which may arise from the laying, constructing, maintaining,
> operating, repairing, replacing or removing of the said pipeline. Said
> damages, if not mutually agreed upon, shall be determined by arbitration
> before three (3) disinterested persons, having appropriate experience and
> expertise, one to be appointed by Grantor, one appointed by Grantee, and a
> third appointed by the two appointed persons, and the award of the three (3)
> persons shall be final and conclusive. Grantor and Grantee shall pay the
> cost of their arbitrator and one-half of the cost of the third arbitrator. If any
> party should fail to promptly appoint an arbitrator, the other party may
> make a motion before any court of competent jurisdiction for appointment
> of an arbitrator, on behalf of another non-performing party.

ECF No. 225 ¶ 12. Other easements do not contain arbitration clauses. An exemplar of the easements lacking arbitration agreements provides:

> The Grantee, by the acceptance hereof, agrees to pay for damages to crops,
> pasture, fences, drainage tile, structures and timber which may arise from
> the laying, constructing, maintaining, operating, repairing, replacing or
> removing of the said pipeline.

Declaration of Anne T. Regan, Ex. 3, ECF No. 199-3 at 3.

Alliance created and managed a Crop Yield Program that collected information about crop productivity on tracts crossed by the Pipeline and compensated landowners and tenants for lower crop yields on the Pipeline right-of-way. ECF No. 283 at 1. Alliance stored this information initially in a database known as LISA and later in a database called LandScribe. Declaration of Kenneth Goulart, ECF No. 225 ¶ 49. From 2002 through 2012, Alliance provided assessments by professional agronomists for landowners and/or tenants who elected to participate in the Crop Yield Program. *Id.* ¶ 32. Alliance made payments through the Crop Yield Program without requiring the landowner and/or tenant to establish that the Pipeline was the cause of a measured crop yield differential. *Id.* ¶ 36. In 2015, Alliance ended the Crop Yield Program, and in 2019, Named Plaintiffs—individuals who have property interests in land crossed by the Pipeline—commenced this litigation. ECF No. 283 at 1.

Plaintiffs allege that Alliance has breached its obligations under individual easements and the AIMAs by terminating the crop loss compensation program and refusing to pay damage claims. The claims pertain specifically to crop losses; Plaintiffs are not seeking relief in this litigation for other forms of possible damage for which Alliance agreed to pay.

Plaintiffs also seek a declaratory judgment "interpreting the Easements and [AIMAs] to require the ongoing payment of crop yield loss damages starting from the

2015 cancellation of the Crop Loss Program, and continuing for the operational life of the Pipeline."

In June 2021, this Court certified a class under Federal Rule of Civil Procedure 23(b)(3) for the breach of contract claim and under Rule 23(b)(2) for the declaratory judgment claim, consisting of:

> All persons or entities who held or hold a land interest on Defendant's Pipeline  Right of Way and who, since 2014, were or are eligible for crop loss compensation pursuant to Easements or Agricultural Impact Mitigation Agreements.

ECF No. 283 at 29.  The Court appointed Named Plaintiffs Nicholas Hein, Mark Hein, Robert Ruebel, Steven Wherry, and Norman Zimmerman as class representatives.  *Id.* The Court determined that the existence of arbitration provisions in some easements did not preclude class certification.  *Id.* at 23.  (Alliance interlocutorily appealed the Class Certification Order, and the Eighth Circuit summarily denied the appeal in August 2021.)

On July 6, 2021, Alliance moved to compel arbitration and dismiss the claims of class members who are subject to easements providing for the arbitration of disputes over crop damages.  The Court heard argument on this motion as well as pending motions for summary judgment on January 10, 2022.[2]

---

[2]     Also pending are cross-motions for summary judgment; numerous motions to exclude expert testimony; and Plaintiffs' motion to approve their proposed class notice plan and form and to direct notice to the class.  ECF Nos. 312, 319, 326, 332, 338, 343, 349, 359, 364, 393.  The parties' dispute regarding arbitration has impeded agreement on the form of class notice.  ECF Nos. 395, 420.  Because class notice has not been completed, the Court reserves its decisions on the dispositive motions and other pending motions until a later date.

## DISCUSSION

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, establishes a "liberal federal policy favoring arbitration agreements" and requires courts "rigorously to enforce arbitration agreements according to their terms, including terms that specify with whom the parties choose to arbitrate their disputes and the rules under which that arbitration will be conducted." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (cleaned up).  The FAA extends as far as federal authority to regulate commerce.  *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 274 (1995).  So where an agreement involves interstate commerce, the FAA applies.  *See Suburban Leisure Ctr., Inc. v. AMF Bowling Prod., Inc.*, 468 F.3d 523, 526 (8th Cir. 2006).

This dispute centers on the contractual obligations of a natural gas pipeline that crosses four states and is regulated by the Federal Energy Regulatory Commission.  The FAA therefore applies to this dispute.

The "arbitrability of a claim turns on (1) whether the parties entered a valid arbitration agreement, and (2) if so, whether the parties' particular dispute falls within the scope of the arbitration agreement." *Sommerfeld v. Adesta, LLC*, 2 F.4th 758, 761 (8th Cir. 2021) (cleaned up).  State contract law governs the first question.  *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 873 (8th Cir. 2018).  The federal substantive law of arbitrability governs the second.  *Id.*

Where, as here, the parties rely on materials outside of the pleadings to support or oppose a motion to compel arbitration, the Court should apply an evidentiary standard analogous to the standard for summary judgment.  *Nebraska Mach. Co. v. Cargotec Sols.,*

*LLC*, 762 F.3d 737, 741–42 (8th Cir. 2014).  Accordingly, for these purposes, the Court should resolve any disputed questions of material fact in favor of the non-movant.  *Id.*

## I.     Valid Arbitration Agreements

Plaintiffs do not directly attack the validity of the easements.  Rather, Plaintiffs contend that the alleged arbitration clauses do not actually reflect agreement to *arbitrate*.  Plaintiffs analogize to cases in which courts have stated that agreements specifying methods of determining the value of something related to a transaction constituted agreements for appraisal rather than agreements for arbitration.  *See Kleinheider v. Phillips Pipe Line Co.*, 528 F.2d 837, 843 (8th Cir. 1975); *Sanitary Farm Dairies v. Gammel*, 195 F.2d 106, 113 (8th Cir. 1952) ("In general, where parties to a contract, before a dispute and in order to avoid one, provide for a method of ascertaining the value of something related to their dealings, the provision is one for an appraisement and not for an arbitration.").

In contrast, the relevant contractual provisions here expressly refer to "arbitration"—differentiating them from the otherwise-similar language in the contracts at issue in *Kleinheider*.  The typical language of the alleged arbitration clauses states that "damages, if not mutually agreed upon, shall be determined *by arbitration*" by three disinterested persons.  Declaration of Nicole Moen, Ex. 7, ECF No. 302-7 at 5–6 (emphasis added).  By their express terms, then, the typical provisions reflect mutual agreement to arbitrate "damages."  Other easements express agreement to arbitrate even more clearly.  For example, one easement provides: "In the event that the parties are unable to agree on the amount of damages for any claim or Grantor's responsibility for

the damage claimed under this paragraph [regarding Grantee's agreement to pay for damages], the parties shall submit the matter to binding arbitration."  Declaration of Nicole Moen, Ex. 4, ECF No. 302-4, at 6.

Notwithstanding some variations in the language of the easements at issue, these easements reflect mutual intent to resolve disputes about crop damages through arbitration.  The parties have entered valid arbitration agreements.

## II.    Scope of the Arbitration Agreements

Given the federal policy favoring arbitration, any "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]"  *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24–25 (1983).  Even so, arbitration remains "a matter of consent, not coercion," and parties "may limit by contract the issues which they will arbitrate[.]"  *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989).

The arbitration provisions' text plainly shows an agreement to arbitrate the issue of "damages to crops" if those damages are not "mutually agreed upon."  The operative complaint leaves no doubt that such "damages to crops" constitute a major issue in the parties' dispute: Plaintiffs allege that Alliance has breached its obligations under individual easements and the AIMAs by refusing to pay for damages to crops.

Plaintiffs argue that the representative arbitration clause—which they have unsuccessfully tried to characterize as an appraisement clause—applies only where there is "disagreement about the amount (not fact) of damages."  The typical arbitration provision does not include the word "amount."  ECF No. 302-7 at 5–6 (providing that

"damages, if not mutually agreed upon, shall be determined by arbitration" by three disinterested persons).  This language is susceptible to an interpretation that provides for arbitration of not only the amount, but also the existence, of damages.  The federal policy favoring arbitration requires the Court to give effect to this interpretation.  *See Moses H. Cone*, 460 U.S. at 24–25.  Moreover, Alliance contends that the amount of crop damages is zero, whereas Plaintiffs assert that damages are nonzero.  Thus, even if the arbitration language applies only to disagreements about the amount of crop damages, the parties' dispute as to the existence of any damages fits within the arbitration agreements' scope.

Additionally, some easements expressly provide for arbitration not only as to crop damages themselves but also as to Alliance's responsibility for such damages.  *E.g.*, ECF No. 302-4 at 6 ("In the event that the parties are unable to agree on the amount of damages for any claim or Grantor's responsibility for the damage claimed under this paragraph [regarding Grantee's agreement to pay for damages], the parties shall submit the matter to binding arbitration.").

Yet, although arbitrable issues clearly are relevant to this dispute, Plaintiffs' claims do not entirely depend on them.  Plaintiffs assert that Alliance breached its contractual obligations by announcing the termination of its Crop Yield Program, and that Plaintiffs are entitled to compensation for any diminution in crop yield on the Pipeline right-of-way even without showing that Alliance caused crop damage.  Plaintiffs also seek class-wide declaratory relief interpreting the requirements of the easements and AIMAs.  These issues are independent of the existence or value of crop damage.  And the disputed question of whether Plaintiffs must establish causation in order to trigger their

contractual compensation rights logically *precedes* the arbitrable question of whether compensable crop damage exists (and in what amount) on any given tract of land.

The result is that some, but not all, of the issues in this dispute are within the scope of arbitration agreements in easements.  The Court therefore will proceed to address Plaintiffs' remaining arguments for resisting arbitration altogether: (1) that Plaintiffs can bring claims under the AIMAs that are unaffected by arbitration agreements in easements, and (2) that Alliance has waived any arbitration rights it may have had.

## III.  Separate Claim Under AIMAs

Plaintiffs argue that even if class members bound by arbitration provisions must arbitrate disputes over crop damages in claims arising under individual easements, these class members can bypass those arbitration provisions by bringing their claims pursuant to separate contracts: the AIMAs.  They would be able to do so only if they have rights to enforce the AIMAs, and if their rights under the AIMAs are outside the scope of the arbitration agreements.

Plaintiffs are third-party beneficiaries of the AIMAs.  The laws of all four states whose laws govern the AIMAs provide that a person can enforce a contract if the parties entering that contract manifested an intent to confer a benefit on that person.  *See Vogan v. Hayes Appraisal Assocs., Inc.*, 588 N.W.2d 420, 423 (Iowa 1999) (discussing third-party beneficiary doctrine under Iowa law); *Dayton Dev. Co. v. Gilman Fin. Servs., Inc.*, 299 F. Supp. 2d 933, 937 (D. Minn. 2003) (same, under Minnesota law); *Altevogt v. Brinkoetter*, 421 N.E.2d 182, 187 (Ill. 1981) (noting that, under Illinois law, a direct beneficiary is a person upon whom the contracting parties have manifested an intent to

10

confer a benefit); N.D. Cent. Code § 9-02-04 ("A contract made expressly for the benefit of a third person may be enforced by that person at any time before the parties thereto rescind it.").  The AIMAs provide for compensation to private landowners affected by the construction of the Pipeline.  *See* ECF No. 199-19 ¶ 8 (providing for compensation to "Landowners and/or Tenants" in North Dakota); ECF No. 199-20 ¶ 10 (providing for compensation to landowners in Illinois); ECF No. 199-21 ¶ 22 (providing for compensation to "Landowners and/or Tenants" in Minnesota and Iowa).  The AIMAs thus reflect an intent to benefit the Plaintiffs in this litigation, making Plaintiffs eligible to enforce them.

The AIMAs do not require arbitration of disputes arising out of the AIMAs—but nor do the AIMAs purport to forbid Alliance from entering arbitration agreements with landowners.  In fact, the AIMAs expressly contemplate Alliance negotiating its AIMA-imposed duties to individual landowners in order to secure easements across those landowners' properties.  *See* ECF No. 199-21 at 3 (providing that mitigative actions in the Iowa-Minnesota AIMA will be followed on private lands in those states unless an "easement specifically provides to the contrary"); ECF No. 199-19 at 2 (same, for the North Dakota AIMA); ECF No. 199-20 at 2 ("All mitigative actions [in the Illinois AIMA] are subject to change by Landowners and Landowner's designates . . . .").

Alliance did just that.  It executed easements that restated the compensation obligations in the AIMAs and provided for arbitration of some disputes about that compensation.  The arbitration agreements in those easements provide for arbitration of "damages" to "crops" (and other property), "if not mutually agreed upon[.]"  ECF No.

302-7 at 5–6.  The agreements do not explicitly limit the application of this language to claims based on the easements themselves, instead encompassing claims for "damages" to "crops" caused by the pipeline.  *Id.*  Thus, to the extent that Plaintiffs' claims under the AIMAs depend on the existence of crop damages, ultimately resolving those claims will require deciding an issue that class members with arbitration easements agreed to arbitrate.

In arguing that crop damage claims brought pursuant to the AIMAs are outside the scope of the easements' arbitration agreements, Plaintiffs offer only authorities that are readily distinguishable from the case at bar.  In *Suburban Leisure Center, Inc., v. AMF Bowling Products, Inc.*, an oral franchise agreement provided for one party's promotion and sale of the other's products, and did not contain an arbitration agreement.  468 F.3d 523, 525 (8th Cir. 2006).  The parties later entered into an e-commerce dealership agreement regarding delivery and installation of one party's products.  *Id.*  The second agreement provided that "any dispute or claim *arising under the Agreement*" would be settled by binding arbitration.  *Id.* (emphasis added).  Because these were "two distinct agreements," and the first was "not covered in any manner" by the second, the first agreement was not within the scope of the second agreement's arbitration provision.  *Id.* at 527; *accord W.R. Millar Co. v. UCM Corp.*, 419 N.W.2d 852, 854 (Minn. Ct. App. 1988) ("[T]he parties' two contracts were for distinct and independent services, making the forum-selection clause in the second contract [regarding a sales representative relationship between the parties] irrelevant to controlling disputes arising out of the earlier contract [regarding appellant's purchase of goods from respondent as an

independent distributor].").  Here, in contrast, the relevant provisions of the AIMAs and easements concern rights to compensation for the very same "damages" to "crops."  *See* ECF No. 302-7 at 5–6.  The AIMA crop damage compensation rights therefore fall within the scope of the arbitration agreements in easements.

Plaintiffs further try to neutralize the arbitration agreements by arguing that Alliance was forbidden from entering agreements that would require arbitration regarding commitments it made in the AIMAs.  Plaintiffs advance two main theories in service of this argument—both of which are unavailing.

First, Plaintiffs contend that Alliance could not validly agree to arbitrate disputes over AIMA-required crop compensation because Alliance, in the course of securing approvals it needed from the Federal Energy Regulatory Commission ("FERC"),[3] committed to follow specific plans for mitigating the pipeline's impacts.  Plaintiffs argue that these plans preclude Alliance from entering arbitration agreements regarding its promises to landowners.  Even if Alliance's assurances to FERC are relevant to anything more than whether Alliance is in compliance with its regulatory requirements—an issue that is not before this Court—Plaintiffs have not identified adequate support for their assertion that FERC prohibited Alliance from entering arbitration agreements with landowners.

That is not for lack of trying.  Plaintiffs point out that the AIMAs do not contain arbitration clauses.  But since the AIMAs do not *prohibit* arbitration agreements, nor does

---

[3]     To construct and operate the Pipeline, Alliance was required to obtain FERC's approval.  *See Alliance Pipeline L.P.*, 84 FERC 61,239, 62,211 (1998).

Alliance's obligation to adhere to the AIMAs as a condition of FERC approval.  The

other FERC-imposed obligations that Plaintiffs assert prohibit arbitration agreements

actually focus on controlling environmental impacts—not on dispute resolution or

compensation.  For example, Plaintiffs point to language in the Pipeline's Final

Environmental Impact Statement prohibiting Alliance from deviating from the measures

specified in FERC's "Plan and Procedures" without prior written approval.[4]  *See* Excerpts

of Final Environmental Impact Statement ("FEIS"), ECF No. 302-8 at 20.  The phrase

"Plan and Procedures" refers to specific environmental compliance plans that are not

relevant to dispute resolution between Alliance and landowners.  *Id.* at 17–19.  Similarly,

the FERC order approving pipeline construction required Alliance to undertake "all of the

*environmental* mitigation measures" recommended in the FEIS.  *Alliance Pipeline L.P.*,

84 FERC 61,239, 62,216 (2018) (emphasis added).  And in an Appendix titled

"Environmental Conditions," that order required Alliance to follow "construction

procedures and mitigation measures" described in Alliance's applications and in the

FEIS, unless Alliance received written approval from FERC's Office of Pipeline

Regulation to perform a mitigation measure affording an "equal or greater level of

environmental protection than the original measure."  *Id.* at 62,224.  Thus, when read in

context, the requirements to adhere to prescribed *environmental* impact mitigation

---

[4]     The National Environmental Policy Act requires a federal agency, such as FERC,
to evaluate the environmental impacts of certain major actions.  42 U.S.C. § 4332.  The
Final Environmental Impact Statement embodies this environmental review.  *Alliance
Pipeline L.P.*, 84 FERC 61,239, 62,215 (2018).

measures did not purport to forbid Alliance from negotiating with landowners regarding the method and procedures for monetary compensation.

Second, Plaintiffs argue that Alliance's promises to pay for certain damages preclude Alliance from insisting upon arbitration. This argument is meritless. Arbitration does not abrogate a substantive right to compensation. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum."); *All Saint's Brands, Inc. v. Brewery Grp. Denmark, A/S*, 57 F. Supp. 2d 825, 828 (D. Minn. 1999) ("Agreement to an alternative process for determining substantive rights does not alter the substantive rights."). Plaintiffs point to Alliance's admissions that compensation for crop damages would be "certain," and assert that therefore Alliance must be precluded "from attempting to erect any procedural or economic obstacles to those unconditional AIMA compensation rights." But Plaintiffs offer no support for that inference. Moreover, Plaintiffs fail to support their implied premise that arbitration presents a procedural obstacle. In entering the arbitration agreements, Alliance and landowners may well have decided that arbitration would be faster and less costly than sorting out crop damage disputes through litigation. *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974) (recognizing that parties may desire arbitration to avoid "the costliness and delays of litigation"). Agreeing to arbitrate disputes about crop damages did not affect Alliance's commitments to pay for such damages.

None of Plaintiffs' arguments for shielding the AIMAs from the scope of certain easements' arbitration agreements withstand scrutiny. The arbitration agreements in easements therefore apply to disputes over damages to crops, regardless of whether those disputes arise under the easements themselves or the AIMAs.

## IV.   Waiver or Default

Plaintiffs further argue that Alliance has waived any rights to arbitrate crop damage disputes. A party waives its right to arbitration if it "(1) knew of an existing right to arbitration; (2) acted inconsistently with that right; and (3) prejudiced the other party by these inconsistent acts." *Lewallen v. Green Tree Servicing, L.L.C.*, 487 F.3d 1085, 1090 (8th Cir. 2007). The parties do not dispute whether Alliance knew of its claimed arbitration rights. Therefore, only the second and third prongs of the test described in *Lewallen* are relevant.

Any doubts concerning a waiver of arbitrability should be resolved in favor of arbitration. *Dumont v. Saskatchewan Gov't Ins.*, 258 F.3d 880, 886 (8th Cir. 2001). Accordingly, a party arguing in favor of waiver or default bears the "heavy burden" to prove that waiver or default has occurred. *Buhler, Inc. v. Reuter Recycling of Fla., Inc.*, 889 F. Supp. 1126, 1129 (D. Minn. 1995) (citing *Ritzel Commc'ns, Inc. v. Mid-Am. Cellular Tel. Co.*, 989 F.2d 966, 968–69 (8th Cir. 1993)).

Plaintiffs fail to carry that burden. The record does not support a finding that Alliance acted inconsistently with its arbitration rights. Alliance notified Plaintiffs early in the litigation that it intended to exercise those rights. In the parties' July 2019 report of required disclosures pursuant to Federal Rule of Civil Procedure 26(f), Alliance stated its

belief that the existence of arbitration agreements would be a defense to claims brought by some members of what was only a putative class until this Court issued a class certification order in June 2021.  ECF No. 27 at 2; ECF No. 283 at 29.

Alliance then continued to defend itself against the claims brought by the Named Plaintiffs—none of whom are subject to easements containing arbitration clauses. Litigating against those claims was not inconsistent with eventually exercising arbitration rights in agreements with non-named putative class members.  That is because *putative* class members are not yet parties to a lawsuit, and as non-parties, they cannot be bound by a judicial order to arbitrate.  *See Devlin v. Scardelletti*, 536 U.S. 1, 16 n.1 (2002) (Scalia, J., dissenting) ("Not even petitioner, however, is willing to advance the novel and surely erroneous argument that a nonnamed class member is a party to the class-action litigation *before the class is certified.*") (emphasis in original); *In re Evanston Nw. Corp. Antitrust Litig.*, No. 07-CV-04446, 2013 WL 6490152, at *4 (N.D. Ill. Dec. 10, 2013) (finding no waiver of arbitration rights after two years of litigation where the only entities with whom a defendant sought to arbitrate were *proposed* class members).  Accordingly, Alliance never has had a basis to demand arbitration of the named plaintiffs' claims, nor did it have any basis to demand arbitration of the non-named plaintiffs' claims at any time before class certification.  *Cf. Messina v. N. Cent. Distrib., Inc.*, 821 F.3d 1047, 1050–51 (8th Cir. 2016) (finding waiver where a defendant had been litigating the very claims it sought to arbitrate against a single defendant).  After this Court certified the class on June 21, 2021, ECF No. 283 at 29, Alliance promptly filed the instant motion on July 6, 2021, ECF No. 284.

The non-party status of class members subject to arbitration easements similarly forecloses Plaintiffs' argument that Alliance waived arbitration by seeking a victory on the merits before the Court certified the class. "[A]ny ruling on the merits of a proposed class action that precedes class certification—whether in defendants' or plaintiffs' favor—has no binding effect on any unnamed class member." *Hartley v. Suburban Radiologic Consultants, Ltd.*, 295 F.R.D. 357, 367 (D. Minn. 2013) (recognizing that it remains "a defendant's prerogative to seek a ruling on the merits that will bind only the named plaintiff"); *Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011) (confirming that a non-named class member is not a party to a class action before the class is certified).

The same principle defeats Plaintiffs' argument that Alliance waived arbitration rights by omitting reference to those rights from its Answer. Plaintiffs contend that arbitration is an affirmative defense that is forfeited unless asserted in a responsive pleading.[5] Some Eighth Circuit authorities do describe the existence of an arbitration agreement as an affirmative defense. *See Messina*, 821 F.3d at 1050–51; *Fogarty v. Piper*, 767 F.2d 513, 515 (8th Cir. 1985). But these cases do not indicate a bright-line rule that a party waives an arbitration right altogether by failing to assert it as an affirmative defense in an Answer. *See Messina*, 821 F.3d at 1051 (analyzing defendant's failure to raise arbitration rights at the "earliest feasible time" within the *Lewallen* waiver

---

[5]     Plaintiffs cite Federal Rule of Civil Procedure 8(c). The rule lists "arbitration *and award*" as an affirmative defense. Fed. R. Civ. P. 8(c)(1) (emphasis added). But this defense "is not that the claim should be arbitrated rather than adjudicated in court; it is that the claim has already been resolved by an award in arbitration." *Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 771 (10th Cir. 2010). Rule 8(c) did not require Alliance to assert the existence of arbitration provisions in its Answer.

test); *Fogarty*, 767 F.2d at 515 (remanding to district court to determine whether the defendant's undisputed failure to plead arbitration as an affirmative defense resulted in waiver of its right to arbitrate).  The fact that Alliance did not assert arbitration rights as an affirmative defense does not compel a finding that Alliance has waived those rights.

Furthermore, since no Named Plaintiffs are subject to the arbitration agreements, Alliance had no reason to raise arbitration as an affirmative defense in an Answer that preceded class certification.  Arguing otherwise, Plaintiffs point out that Alliance's Answer did assert some defenses against Named Plaintiffs *and* putative class members. Plaintiffs conclude that the absence of arbitration among these listed defenses means that Alliance "dropped its arbitration defense."  But Alliance's Answer asserted no defenses against *only* the non-named, putative class members.  ECF No. 51 at 16–18.  The pleading is therefore consistent with Alliance's intention to demand arbitration if and when putative class members with arbitrable claims became members of a certified class. By moving to exercise its arbitration rights just fifteen days after class certification, Alliance did "all it could reasonably have been expected to do to raise its right [to arbitration] at the earliest feasible time."  *Messina*, 821 F.3d at 1050 (internal quotation omitted).

Even if Plaintiffs could show that Alliance had acted inconsistently with its right to arbitrate crop loss disputes with some class members, Plaintiffs have not met the third prong of the *Lewallen* waiver test: prejudice.  *See Lewallen*, 487 F.3d at 1090.   Plaintiffs claim that Alliance sought substantial and expensive discovery pertaining to putative class members, and assert that the cost of that discovery prejudices them.  The argument

lacks merit.  The only discovery requests that Plaintiffs cite sought information

concerning the *named* plaintiffs.  *See* Declaration of Michael Cashman, Ex. 6, ECF No.

298-6 at 6 (seeking documents "reflecting or memorializing any communications

between any Plaintiffs *and any other person, including* a putative Class member, besides

legal counsel, relating to the allegations in the complaint") (emphasis added); *id.* at 7

(seeking documents "provided *to any Plaintiff* by any putative class member . . . .").

Plaintiffs thus fail to show any evidence that Alliance wasted Plaintiffs' time and

resources by seeking discovery that would be proper only as to allegedly arbitrable

claims.

> For all of these reasons, Plaintiffs have not discharged their burden to prove

waiver.[6]  Plaintiffs thus have established no basis on which class members who are

subject to arbitration agreements may avoid arbitration regarding their crop damages.

## V.   Relief

> "The Federal Arbitration Act requires a district court to issue a stay if an issue in

the case is 'referable' to arbitration."  *Reid v. Doe Run Res. Corp.*, 701 F.3d 840, 845 (8th

Cir. 2012) (citing 9 U.S.C. § 3).  Where a case involves claims or issues that are not

subject to arbitration, the district court has discretion over whether to stay the entire case

or instead to allow litigation to proceed on the non-arbitrable claims or issues.

---

[6]   For the same reasons that Alliance has not waived its right to arbitration, it is not
in default of its arbitration rights. *See N & D Fashions, Inc. v. DHJ Indus., Inc.*, 548 F.2d
722, 728 (8th Cir. 1976) (treating "default" under Section 3 of the Federal Arbitration Act
as synonymous with "waiver" in the sense of taking action inconsistent with a right to
arbitration).

20

*Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 971–72 (7th Cir. 2007)

(collecting cases, and affirming district court's refusal to stay non-arbitrable issues that

could offer the plaintiff a path to relief independent of the arbitrable issues).  To decide

whether a stay of non-arbitrable claims or issues is appropriate, a district court should

"weigh three factors: (1) the risk of inconsistent rulings; (2) the extent to which the

parties will be bound by the arbiters' decision; and (3) the prejudice that may result from

delays."  *Reid*, 701 F.3d at 845 (citing *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co.

of Pittsburgh, Pa.,* 242 F.3d 777, 783 (8th Cir. 2001)); *Volkswagen*, 474 F.3d at 972.[7]

    In this case, where more than 1,700 easements subject class members to arbitration

provisions, staying the non-arbitrable issues would increase the risk of inconsistent

rulings.  In contrast, class-wide judicial resolution of the causation standard that applies

to the easements' and AIMAs' compensation provisions would promote consistency in

arbitrators' approach to determining the amounts of compensable damage to crops.  And

judicial resolution of the other non-arbitrable issues, such as whether the requested

declaratory relief is appropriate and whether the announcement of the Crop Yield

Program termination breached the easements or AIMAs, would present no conflict with

---

[7]     Alliance seeks a full dismissal of the claims of class members who are subject to
arbitration agreements.  "The FAA generally requires a federal district court to stay an
action pending an arbitration, rather than to dismiss it."  *Green v. SuperShuttle Int'l, Inc.*,
653 F.3d 766, 769 (8th Cir. 2011).  But in the Eighth Circuit, a court has discretion to
dismiss a case where it is "clear that the entire controversy between the parties will be
resolved by arbitration."  *Id.* at 770.  It is not clear that arbitration will resolve the entire
controversy between the parties in this case, because—as discussed in this order—non-
arbitrable issues may afford Plaintiffs an avenue for relief.  Dismissal therefore is not
appropriate.  *See id.*

an arbitral decision on "damages to crops."  Proceeding with litigation of the non-arbitrable issues accordingly poses no significant risk that arbitrators and the Court will deliver inconsistent rulings on non-arbitrable issues.

For similar reasons, the second *AgGrow/Reid* factor also does not warrant a discretionary stay of non-arbitrable issues.  The Eighth Circuit has not given clear guidance for applying this factor.  *LS Black Constructors, Inc./Loeffel Constr. v. Pilgrim Interiors, Inc.*, No. 21-CV-654 (NEB/DTS), 2021 WL 3080961, at *3 (D. Minn. July 21, 2021).  But the fact that the affected class members agreed to resolve only the question of "damages to crops" (and, at least in some cases, Alliance's responsibility for that damage) through arbitration means that the arbitrations are unlikely to bind any class members as to non-arbitrable issues—and certainly will not bind the class members against whom Alliance has not invoked any arbitration agreements.  Therefore, this factor does not weigh in favor of a stay.  *See Anderson v. Evangelical Lutheran Good Samaritan Soc'y*, 308 F. Supp. 3d 1011, 1018 (N.D. Iowa 2018) (finding discretionary stay not appropriate where there was no indication that an arbitral decision on non-arbitrable claims would be binding in litigation).

As to the third *AgGrow/Reid* factor, a stay of non-arbitrable issues would delay the resolution of Plaintiffs' claims.  The Court has received briefing and oral argument on the parties' summary judgment motions, in which Plaintiffs assert that non-arbitrable issues described above entitle them to relief.  Because class notice is not complete, the Court will refrain from expressing any view on the merits of those arguments at this time.  *See McKeage v. Bass Pro Outdoor World, L.L.C.*, No. 12-03157-CV-S-GAF, 2014 WL

12921607, at *15 (W.D. Mo. July 30, 2014) ("While there is no Eighth Circuit case on point to support the proposition that notice must precede adjudication, the Court believes it the best practice to afford class members notice and an opportunity to opt out prior to determining the merits of Plaintiffs' Motion for Summary Judgment.").  For purposes of the instant motion to compel arbitration, the Court simply observes that these non-arbitrable issues *can* be resolved as to the entire class—and indeed, these are questions that made class certification appropriate.  *See* ECF No. 283 at 21, 28.  Therefore, to issue a complete stay of the claims of a majority of class members would sacrifice efficiencies of class treatment and needlessly prolong the proceedings.  Without deciding whether this delay would cause prejudice, the Court finds that it counsels against staying non-arbitrable issues.

## CONCLUSION

Alliance has presented valid arbitration agreements that apply to some but not all of the issues in this litigation.  Resolving non-arbitrable issues on a class-wide basis before addressing issues that are arbitrable with respect to some class members will fulfill the purposes of class treatment.  The Court therefore will grant a limited stay of its consideration of arbitrable issues as to class members who are subject to arbitration agreements.

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.    Alliance's motion to compel arbitration and dismiss arbitrable claims [ECF No. 284] is GRANTED in part and DENIED in part as discussed herein.

2.    Claims concerning tracts that are subject to easements containing arbitration agreements, as tabulated in Exhibit 3 of the August 10, 2021 Declaration of Nicole Moen [ECF No. 302-3], are STAYED only as to the following issues: whether crop damages arising from the Pipeline have occurred or will occur on those tracts; and the amount or value of those damages.  With respect to all other issues, litigation shall proceed.

Dated: March 24, 2022                                      s/  Joan N. Ericksen
                                                   JOAN N. ERICKSEN
                                                   United States District Judge